572 P.2d 100

**Ernest W. McGEORGE and Ruth K. McGeorge, surviving parents of Ronald Craig McGeorge, Deceased, Appellants,**

v.

**CITY OF PHOENIX, Arizona, a Municipal Corporation, Lawrence M. Wetzel, Chief of Police, City of Phoenix, Arizona, John B. Wentz, City Manager, City of Phoenix, Arizona, Michael D. Chambers, Police Officer employed by the City of Phoenix, Arizona, and Jane Doe Chambers, his wife, Appellees.**

**No. 1 CA–CIV 3169.**

Court of Appeals of Arizona, Division 1, Department C.

Oct. 4, 1977.

Rehearing Denied Nov. 15, 1977.

Review Denied Dec. 6, 1977.

Harrison, Myers & Singer, P. C. by Noel
K. Dessaint, Robert D. Myers, Phoenix, for
appellants.

Jennings, Strouss & Salmon by John S. Hobbs, Roxana C. Bacon, Phoenix, for appellees.

## OPINION

FROEB, Chief Judge.

This case involves a consideration of the tort liability of a police officer where he fails to prevent an irate person from taking violent action against another.

The trial court determined there was no liability and granted summary judgment dismissing the complaint. This appeal followed.

The untoward but unfortunately not uncommon circumstances bringing this lawsuit about arose on November 13, 1972, in the City of Phoenix. On that day, Calvin Sneed, residing at 4404 East Oak Street, discovered a 1964 Ford Falcon pickup parked in his driveway. Thinking the vehicle was abandoned and not knowing who the owner was, Sneed called the police to investigate. Officer Michael D. Chambers of the Phoenix police responded to the call and arrived at the Sneed property about 5:30 P.M. After looking at the inside of the truck, Chambers determined that it was not a stolen vehicle and learned from papers in the car that Ronald McGeorge was the apparent owner.

Chambers and Sneed then discussed the situation, the details of which appear in the record both from depositions as well as the police report filed by Chambers.[1]

Sneed, a 46 year old man, was very disturbed about the presence of the truck. In addition, he was annoyed over disturbances around his home and property caused by both moving and parked vehicles. He specifically complained about the use of his driveway for turning and parking. He also was annoyed by students from nearby Gerard High School sitting along his fence waiting for school buses, by a fire occurring during the preceding summer in a vacant lot near his property, and by a telephone call some three weeks earlier in which, he claimed, someone threatened his life. He told Officer Chambers that he had weapons close by for his protection. He also told Chambers that someone in the Chandler area had been similarly plagued and had taken matters into his own hands and "got off with only six months probation."

In furtherance of his investigation, Chambers completed what is known as a "36 card," a procedure which Chambers admitted was prompted because he thought Sneed might resort to violence. Chambers wrote the following statement on the card:

1. The relevant portion of Officer Chambers' police report gives further details of the meeting between Chambers and Sneed:

Mr. SNEAD [sic] said that he recently had received a phone call threat by person/s unknown threatening to kill him. He said he was keeping weapons close by as a result and was very "touchy-spookie". He complained that at the time of the threat he called police and made a report. He was irate because telephone company security office took 10 days before sending forms for him to fill out to tap his phone line and make follow-up. He complained that this was another case of receiving no assistance from agencies when requesting help. He continued on about people taking matters into their own hands and gave example of a man who, per him, in Chandler area had recently killed people due to problem and received 6 months probation. He pointed out had he been the Suspect in that situation he would not have gotten off.

Assigned Officer suggested to SNEAD that when vehicles are abandoned on his property

in future to merely call a wrecker and have it towed off. Mr. SNEAD said in that case he would be sued or something. Assigned Officer assured him that if the vehicle was stolen police would see it was removed but if not it would be left.

Mr. SNEAD also complained that due to vehicular traffic in the area he could not sleep at night as cars were constantly squealing their tires in and around the intersection of 44th Street and Oak. He added that person/s unknown had driven a vehicle in his driveway this afternoon and thrown rocks and dirt as they drove off. He said had he been able to catch that subject he would have broken his neck.

At the earlier contact Mr. SNEAD was dressed as at time of his arrest. His manner was very calm but verbally irate due to the complaints previously listed. Without coming out and saying so SNEAD gave Assigned Officer the impression that he might resort to violence due to these complaints and for this reason Assigned Officer made "36" card on abandoned vehicle complaint.

Subject complained of above described vehicle abandoned in front yard of his home. Had no idea of how long vehicle has been there or who left it. . . . Subject irate due to several recent similar occurrences. Also adds that due to recent telephone threats he is keeping firearms handy. He hinted that he may have to resort to violence to keep the cars off his property. A/O suggested to have cars towed away.

Sneed wanted the police to remove the truck from his property, but Chambers suggested that Sneed call a towing company to have the vehicle removed. Sneed replied that he was worried he might be sued. Chambers stated that the police had no authority to remove a parked car immediately but that if it were a stolen car the police would eventually remove it.

Sneed was dressed in normal attire and his manner was calm and controlled, although he was "quietly angry." At no time did Chambers see a gun. Sneed made no direct threats of violence toward anyone and at no time said that he would shoot the driver of the truck parked on his property. Nevertheless, as earlier stated, Chambers had the impression that Sneed might resort to violence.

Officer Chambers left the Sneed property without pursuing the matter further. Fifteen minutes later, Ronald McGeorge appeared on the premises with a can of gas to start his parked car. Sneed, then armed with a gun, shot McGeorge, who died later as a result of the wound. Police responded to the shooting and arrested Sneed. This wrongful death suit followed, brought by the survivors of Ronald McGeorge against Officer Chambers and the other city officials named in the caption of the case.

The basic legal issue presented by appellants is whether the undisputed factual circumstances of this case gave rise to a legal duty on the part of any or all of the appel-

lees, the breach of which would entitle appellants to recover in tort for the death of McGeorge. Specifically, the issues raised by appellants are:

1. Does the police officer have a duty of reasonable care (a) to prevent violence, (b) to protect the victim, (c) to warn the victim?

2. Does a municipality have a duty of reasonable care to train and instruct its police officers on how safely and adequately to conduct investigations and control violent persons so that injuries are not inflicted on innocent persons?[2]

3. Have the appellants been denied equal protection of the law guaranteed by the fourteenth amendment of the United States Constitution because in other similar circumstances a municipality and its employees have a duty not to injure other persons negligently?

■■■ The bar to suit in tort against the State and its instrumentalities was lifted in Arizona by the decision of our Supreme Court in *Stone v. Arizona Highway Commission,* 93 Ariz. 384, 381 P.2d 107 (1963). However, as we pointed out in *Barnum v. Rural Fire Protection Company,* 24 Ariz. App. 233, 537 P.2d 618 (1975), the removal of the defense of sovereign immunity did not create any new liability for a public body. Liability to an individual for damages will not arise where the public body owes a duty to the general public as a whole unless it is shown that it owes a specific duty to the individual. *Massengill v. Yuma County,* 104 Ariz. 518, 456 P.2d 376 (1969). What will bring into existence a duty to the individual will of course depend on the facts of each case.

*Massengill* is the leading case in Arizona on this question and, like the present case, involved claimed failure of police protection. While seated in his vehicle parked on the side of a busy highway, a deputy sheriff observed two cars, travelling side by side,

---

**2.** These issues arise out of allegations made in both the original complaint and proposed amended complaint filed by appellants. Although the trial court denied appellants' motion to file the amended complaint, its judgment treated the allegations of the amended complaint as before the court and ruled accordingly. On appeal we have considered all the issues in both pleadings as did the trial court.

pass him going at a high rate of speed down the highway. The deputy sheriff followed the cars but made no effort to apprehend them. A head-on collision involving an oncoming car thereafter occurred which resulted in severe injury and death. In the wrongful death suit against the county sheriff for failure to apprehend and arrest the drivers of the cars when they violated the traffic laws preceding the fatal accident, the Arizona Supreme Court upheld dismissal of the complaint for failure to state a claim upon which relief could be granted. The court stated the general rule of liability in such a situation as follows:

> * * * if the duty which the official authority imposes upon an officer is a duty to the public, a failure to perform it, or an inadequate or erroneous performance, must be a public, not an individual injury, and must be redressed, if at all, in some form of public prosecution. *Id.* at 521, 456 P.2d at 379.

The court recognized that:

> * * * there are situations where a government, or agency thereof, can by its conduct, narrow an obligation owing to the general public into a special duty to an individual, for the breach of which it is responsive in damages. *Id.* at 523, 456 P.2d at 381.

In holding that the duty of the county sheriff in *Massengill* was one owed to the general public and not to individuals, the court said:

> What the plaintiffs urge here is a doctrine that the obligations of public officers are duties owned [sic] personally to each and every individual member of the public. The extent of potential liability to which such a doctrine could lead is staggering. By our decisions in *Stone, supra* [*Stone v. Arizona Highway Commission*, 93 Ariz. 384, 381 P.2d 107], *Veach, supra,* [*Veach v. City of Phoenix,* 102 Ariz. 195, 427 P.2d 335], and *Patterson, supra* [*Patterson v. City of Phoenix,* 102 Ariz. 195, 427 P.2d 335], we stripped the shackles of sovereign immunity from persons seeking redress for negligent injuries caused by public officers, but we

did not relieve claimants of the responsibility of establishing, all the elements of actionable negligence. *Id.*

Subsequent to the decision of the Supreme Court in *Massengill,* both Divisions One and Two of the Court of Appeals have decided cases following these principles. In *Duran v. City of Tucson,* 20 Ariz.App. 22, 509 P.2d 1059 (1973) the court found that the Tucson Fire Department was not liable to an individual fire victim upon its failure to enforce a provision of the fire code following an annual inspection. In *Ivicevic v. City of Glendale,* 26 Ariz.App. 460, 459 P.2d 240 (1976) liability of the police for negligence was denied where officers allowed a motorist to operate a car in an intoxicated condition. In *Delarosa v. State,* 21 Ariz. App. 263, 518 P.2d 582 (1974) the court found that the state breached no duty to individuals harmed in a school bus accident for failure of the state to inspect the brakes of the bus. In *Besserman v. Town of Paradise Valley,* 116 Ariz. 471, 569 P.2d 1369 (filed July 18, 1977) the court found no individual duty toward a homeowner arose by reason of the omissions of a town building inspector. Finally, the Arizona Supreme Court recently reaffirmed the *Massengill* principle in *Grimm v. Arizona Board of Pardons and Paroles,* 115 Ariz. 260, 564 P.2d 1227 (1977) while at the same time it altered the absolute immunity rule as to public officials acting in their discretionary functions. The Supreme Court also applied the *Massengill* principle recently in *Boyle v. City of Phoenix,* 115 Ariz. 106, 563 P.2d 905 (1977) where it found no duty owing to a bicyclist struck by a car when vegetation obscured the view of an intersecting street.

Thus, the question in the present case becomes whether Officer Chambers and the Phoenix police, by their conduct, narrowed the obligation which was owing to the general public into a special duty toward McGeorge. If so, they would be liable to appellants for a breach of duty if the remaining elements of the alleged negligence were proven.

There are no easy measures to apply in analyzing this question. Duty is a question

of "the relation between individuals which imposes upon one a legal obligation for the benefit of the other . . . [i]n other words . . . whether the defendant is under any obligation for the benefit of the particular plaintiff." Prosser, *The Law of Torts* 324 (4th ed. 1971).

■ In the narrow field of police protection, however, we can discern certain general situations where duty toward specific individuals can be found. One is where there has been a specific promise or representation by police to a person in a situation which creates justifiable reliance. This may be illustrated by *Schuster v. City of New York*, 5 N.Y.2d 75, 180 N.Y.S.2d 265, 154 N.E.2d 534 (1958) where a police informer was promised protection by the police but did not receive it. The court upheld the existence of a specific duty to the individual involved. *See also Swanner v. U. S.,* 309 F.Supp. 1183 (M.D.Ala.1970). Another such case is *Baker v. City of New York*, 25 A.D.2d 770, 269 N.Y.S.2d 515 (1966) which held that proof of police failure to give court ordered protection to the plaintiff made out a prima facie case against a municipality. Another general situation is where a police officer affirmatively causes damage to an individual. An example of this is *Gardner v. Village of Chicago Ridge*, 128 Ill.App.2d 157, 262 N.E.2d 829 (1970) where the victim of an assault was brought by police to a place where he could identify his three assailants. Because of carelessness on the part of the police, one of the assailants broke loose and attacked the victim. Again, to the same effect, although involving a city sewer inspector, is *Smullen v. City of New York*, 28 N.Y.2d 66, 320 N.Y.S.2d 19, 268 N.E.2d 763 (1971). In that case the inspector observed an open trench and directed an individual to climb into it, whereupon he was killed when it collapsed upon him. The court said the inspector narrowed the duty to the individual by his "positive action assuming direction and control." Another instance is where a city fire department ordered a salvage operator to fill the cargo compartments of a damaged ship with carbon dioxide to reduce the possibility of an explosion. Instead, the chemical produced an explosion causing a loss of the ship. The court found that a duty existed in this situation when the fire department elected to act. *In re M/T Alva Cape*, 405 F.2d 962 (2d Cir. 1969).

■ We turn then to the facts of this case. Had a duty narrowed toward McGeorge which required use of reasonable care by Officer Chambers for his protection? We think not. There was no statutory duty requiring the police to arrest or detain Sneed. It is true that Sneed was "quietly" irate and made remarks indicating his potential for violence. Yet the remarks were not directed toward any particular person. Appellants argue that Chambers should have detained Sneed as a mentally ill person under the mental health laws of the state. Even if we were to assume, as defined in the statutes, that Sneed was mentally ill, an assumption we are not prepared to make from the record, the mental health laws only gave potential authority to the police officer to detain, but they did not, standing alone, give rise to an individual duty owed to Ronald McGeorge. Furthermore, we do not think that any duty Chambers owed to the public generally had narrowed so as to create a duty toward McGeorge. A police officer in a field situation should not have to resolve the dilemma of whether to make a preventative detention which might turn out to be a false arrest or not to do so and risk a tort suit for later consequences.

The next issue relates to whether appellees had a duty to warn McGeorge of the danger posed to him by Sneed. Appellants argue that this duty toward McGeorge arose when Chambers became aware of Sneed's frame of mind, witnessed his threats, and learned that he possessed a weapon.

■ There is no separate tort named "failure to warn." Where liability is incurred by reason of a "failure to warn" it is because there is found present a duty to prevent harm to the individual who is injured. The "failure to warn" may in a given case be the means by which that duty

is breached. A case relied upon by appellants, *City of Scottsdale v. Kokaska,* 17 Ariz.App. 120, 495 P.2d 1327 (1972), illustrates this. There the plaintiff was injured in an automobile accident when her car collided with a police vehicle which was chasing a speeder. This court upheld a verdict based in part on a finding that the police officer had a duty to use his siren to warn the plaintiff of his approach. Yet the duty to warn there was inextricably entwined with the police officer's affirmative conduct in chasing the speeder. Therein lies the difference between this case and *Kokaska.* Chasing a speeder with a patrol car was affirmative conduct which gave rise to a duty not to injure foreseeable individuals in the path of the action. In this case there was no affirmative conduct which would give rise to a duty toward an individual. In other words, Officer Chambers owed a duty to the general public, but that duty had not narrowed to a duty to prevent harm to Ronald McGeorge.

Thus the "duty to warn" must, in this case, be analyzed as part of the larger question of whether there existed any duty at all toward McGeorge. We think none arose under the undisputed facts. The failure to warn does not occupy a special place in the law of negligence which would require us to apply a different concept of duty.

The recent decision of the California Supreme Court in *Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976) came to the same conclusion on even stronger facts. Action was brought against university regents, psychotherapists employed by the university hospital, and campus police to recover for the murder of plaintiff's daughter by a psychiatric patient. During the course of psychotherapy, Poddar confided to his psychologist that it was his intention to kill Tarasoff. On the request of the psychologist, the campus police briefly detained Poddar but released him when he appeared rational. No one warned Tarasoff of the impending peril and she was thereafter slain. Although the court decided that the psychologist owed a duty to Tarasoff to use reasonable care for her protection, which

included a duty to warn, the court rejected such a duty on the part of the police, stating that there was present no special relationship sufficient to impose the duty upon them.

The next question presented by appellants is whether the municipality owed a duty to McGeorge to train and instruct its police officers on how safely and adequately to investigate and control violent persons so that harm would not have been inflicted upon him. Appellants refer us to no authority for imposing such a duty to an individual as opposed to the general public and we have found none. Absent the special relationship which we have discussed earlier, we must reject this theory as giving rise to liability in this case.

As a further issue, appellants contend that the rule of liability in *Massengill* violates the fourteenth amendment of the United States Constitution because it denies to appellants the equal protection of the law. This argument is based on the contention that the *Massengill* rule places police in a special class of limited liability not accorded other categories of potential tortfeasors. We find no merit to this. It is well settled that classification for purposes of imposing liability does not offend the equal protection clause where it has some rational connection with a legitimate state interest. *See, e. g., Forbush v. Wallace,* 341 F.Supp. 217 (M.D.Ala.1971), aff'd, 405 U.S. 970, 92 S.Ct. 1197, 31 L.Ed.2d 246 (1972). There is clearly good reason, as pointed out in *Massengill,* to require a special relationship between the police and the individual before a duty of reasonable care will arise. To hold otherwise would place an impossible burden on law enforcement and interfere with the law enforcement function. Moreover, the argument misplaces the thrust of equal protection, since the concept protects equal treatment of potential plaintiffs in the assertion of similar claims, rather than to guarantee to potential plaintiffs similar rules of liability against different tortfeasors. We recently rejected a similar equal protection argument in *Landgraff v.*

*Wagner,* 26 Ariz.App. 49, 546 P.2d 26 (1976), *appeal dismissed,* 429 U.S. 806, 97 S.Ct. 40, 50 L.Ed.2d 67 (1976).

Finally, appellants argue that the trial court erred in granting summary judgment because there were disputed facts and disputed inferences to be drawn from those facts. We do not agree. The sole issue was the question of the existence of a legal duty owed to McGeorge. In determining this legal question adversely to appellants, the trial court and this court have reviewed the factual record, including all reasonable inferences arising from it, most strongly in their favor.

Affirmed.

JACOBSON and HAIRE, JJ., concurring.