594 P.2d 1010

**Franklin R. DeHONEY and Virginia R. DeHoney, husband and wife, and Donald Malquist and Mary Jo Malquist, husband and wife, doing business as the Showcase, a Co-Partnership, Appellants,**

v.

**Serapio HERNANDEZ, David Wayne Hovis, Gerald Lee Edwards, James Hill, and the City of Casa Grande, a Body Politic, John Doe, One through Five (1–5) and XYZ Corporation, One through Five (1–5), Appellees.**

No. 2 CA–CIV 2904.

Court of Appeals of Arizona, Division 2.

Oct. 31, 1978.

Rehearing Denied Dec. 6, 1978.

Review Granted Jan. 9, 1979.

Stanfield, McCarville, Coxon, Cole & Fitz-gibbons, by A. Thomas Cole, Casa Grande, for appellants.

Murphy & Hazlett, by Thomas M. Murphy and Scott Goering, Tucson, for appellees.

## OPINION

HOWARD, Judge.

This is an appeal from a judgment on a directed verdict for appellees. The primary question is whether the police department is liable for the losses from a burglary where the victim's premises are protected by a silent burglar alarm system connected with the police department, the police have made representations to the victim about their procedure in responding to silent burglar alarms and negligently fail to follow that procedure, and this failure is the proximate cause of the burglary losses. The court below decided that there would be no liability even if these facts were assumed to be true. We reverse and remand for a new trial. If the above facts are established at trial, the appellees are liable for the appellants' losses.

We will view the evidence in the light most favorable to appellants. *Tanner v. Levie*, 105 Ariz. 149, 460 P.2d 995 (1969).

Appellants Franklin and Virginia DeHoney own a jewelry and framing store in Casa Grande called the Showcase. At the time of the burglary which gave rise to this action they were in the process of finalizing a partnership with appellants Donald and Mary Jo Malquist who had provided nearly half of the stock of Indian jewelry. Profits were being shared equally by the DeHoneys and the Malquists.

In the winter of 1974–1975, the DeHoneys were planning to expand their inventory of Indian jewelry. Because there would be an increased risk of theft, they were simultaneously planning to improve the store's security. Mr. DeHoney had casual conversations with several Casa Grande police officers and they all recommended a silent alarm system. Another officer came to the store, unbidden by appellants, specifi-

cally to talk about security systems. He too stressed the advantages of a silent alarm system over other security measures. Finally, Mr. DeHoney visited the police station to discuss a silent alarm system with someone there. He spoke with Lt. Bain, who basically seconded what the other men had said.

When a burglar sets off a silent alarm, he has no way of knowing he has done so. An alarm goes off somewhere else; in Casa Grande, silent alarms were connected to go off at the police station. All the police officers with whom Mr. DeHoney had discussed this described the same general response procedure, as follows. The dispatcher sends policemen to the building where the alarm has been triggered. They secure the entrances so the intruder cannot escape and wait until the owner, who has been notified by the dispatcher, arrives. All the officers told DeHoney about their excellent response time record, estimating a response time of 30 seconds to two minutes for the Showcase. The officers said that silent alarms promise a chance to apprehend an intruder because he has not been warned to flee, as he would have been by an audible alarm, the police are notified as soon as he enters the building, and know which building's alarm has gone off. They also said they felt this system was superior to other security measures because they are alerted to the intruder's precise location.

Mr. DeHoney testified that he had not considered an alarm system before these conversations with the police officers. He had not been aware that they were feasible for small businesses.

In January of 1975, the DeHoneys installed a silent burglar alarm system in the Showcase. It could be activated by someone tampering with the doors or windows, or by something breaking one of several infrared beams which criss-crossed the interior of the store. The alarm was connected to go off at the Casa Grande police station.

On June 30, 1975, the alarm for the Showcase went off at the police station at 2:11 a. m. The dispatcher, appellee Edwards, immediately dispatched appellee Hernandez to the site of the alarm. At 2:13 Sgt. Hernandez and appellee Hill simultaneously arrived at the Showcase's front door and appellee Hovis arrived at the back. Both doors were secure; the police did not see any signs of disturbance. Sgt. Hernandez directed Edwards to telephone the proprietor and Hovis to stay in the general area. The three officers then left.

Tony Leon, the burglar, testified that he entered the Showcase through an air vent on the roof, broke through the ceiling and jumped down to the floor. Within a few minutes he heard the police at the front door. He dropped to the floor behind the counters and watched them check the doors, talk for a few minutes, and leave. He thought it was a routine door check. Leon then filled a box with Indian jewelry, broke the padlock on the back door, and left. He estimated he spent about 30 or 40 minutes in the store.

Meanwhile, dispatcher Edwards had been delayed in telephoning Mr. DeHoney. He had other duties to attend to and had trouble finding the telephone number. Mr. DeHoney was not telephoned until 2:41 a. m. He got to his store quickly, entered it with Officer Hovis, and saw that a large quantity of Indian jewelry had been stolen. The store was well lighted, and the holes in the ceiling, broken pieces hanging from the ceiling, and debris on the floor were clearly visible. Tony Leon said that as he drove away with the jewelry he saw Mr. DeHoney and the policeman enter the store.

Appellants brought this action against the policemen who responded to the burglar alarm at the Showcase that night, the dispatcher Edwards, and their employer the City of Casa Grande, on the theory that their negligence led to appellants' losses. After appellants presented their case, the trial judge granted appellees' motion for a directed verdict. He found that there was no special duty owing to appellants, therefore no liability even if the jury found there was negligence. We find, on the contrary, that the Casa Grande Police Department did owe a special duty to the appellants.

In tort actions against a government body, although the defense of governmental immunity has been abolished, *Stone v. Arizona Highway Commission*, 93 Ariz. 384, 381 P.2d 107 (1963), the elements of liability still must be established, just as in an action against a private individual. In Arizona, liability in a claim founded on negligence depends on a showing that (1) the defendant had a duty to protect the plaintiff from the injury of which he complains; (2) the defendant failed to perform that duty; and (3) such failure was the proximate cause of the plaintiff's injury. *Shafer v. Monte Mansfield Motors*, 91 Ariz. 331, 372 P.2d 333 (1962).

In *Massengill v. Yuma County*, 104 Ariz. 518, 456 P.2d 376 (1969) the court stated that there are situations where a government, or agency thereof, can by its conduct narrow an obligation owing to the general public into a special duty to an individual, for the breach of which it is responsive in damages. The apprehension of law violators is a general duty owed to the public and not to individuals. *Massengill v. Yuma County*, supra. The question here is whether the conduct of the police narrowed that duty to a special duty. Instructive on this point is the case of *McGeorge v. City of Phoenix*, 117 Ariz. 272, 572 P.2d 100 (App.1977). There the court stated:

> "In the narrow field of police protection, however, we can discern certain general situations where duty toward specific individuals can be found. *One is where there has been a specific promise or representation by police to a person in a situation which creates justifiable reliance.*" (Emphasis added) 117 Ariz. at 277, 572 P.2d at 105.

As authority for this statement the court cited *Schuster v. City of New York*, 5 N.Y.2d 75, 180 N.Y.S.2d 265, 154 N.E.2d 534 (1958), *Swanner v. United States*, 309 F.Supp. 1183 (M.D.Ala.1970) and *Baker v. City of New York*, 25 A.D.2d 770, 269 N.Y. S.2d 515 (1966). Our examination of these cases discloses that they do not entirely stand for the proposition which the court enunciates.

The court in *McGeorge* states that in *Schuster* the police promised protection to an informer. The facts do not disclose this. In *Schuster* an informant gave information to the police concerning a notorious criminal which led to the arrest of the criminal. The role of the informant was widely publicized and when threats were made on his life he called the police for protection. The police did not take the threats seriously and gave no protection. The informant was murdered. The court held:

> "Nevertheless, where persons actually have aided in the apprehension or prosecution of enemies of society under the criminal law, a reciprocal duty arises on the part of society to use reasonable care for their police protection, at least where reasonably demanded or sought." 180 N.Y.S.2d at 270, 154 N.E.2d at 537.

In *Swanner* an informer and his family were injured when a bomb exploded under their house. The government knew that Swanner had been threatened by a person in whose arrest Swanner had been instrumental. The court held that the government had a duty to protect its informers when it comes to its attention that they are in danger.

The other case cited by *McGeorge, Baker v. City of New York*, supra, involved an order of protection issued by the court. It authorized the police to arrest a husband if he violated the court's restraining order. In holding that there was a special relationship created between the municipality and the wife, the court stated that she had been singled out by the judicial process as a person in need of special protection and the police officers had a duty to supply her that protection when it was requested. If one construes the order of protection as a promise or representation, this case comes close to the rule in *McGeorge*.

Even if the authority cited by *McGeorge* may be questionable, it does not detract from the soundness of the rule which it attempts to set forth in deciding when a general duty is narrowed to a special one. When the police represent to a

specific person that they will take certain specific steps to protect him or his property in exchange for a benefit conferred upon the police, and that person relies on such representation, a special duty arises.

■ Turning our attention to the facts here, the police told DeHoney the specific steps they would take in response to the alarm, in particular, that they would secure the entrances and call the owner. They also told him that this system was safer than other security measures. The police were "pushing" the silent alarm because it gives them a chance to catch the intruder. There were alternative protective measures available such as an audible alarm if DeHoney had not relied on the representations made by the police. We hold that the facts create a special duty owed by the police to DeHoney.

■ Appellees claim that assuming the existence of a duty, it only extends to the DeHoneys and not to the Malquists. They base this argument on the fact that the representations were made to DeHoney prior to the formation of the partnership between the appellants. Therefore, they contend the trial court was correct in directing a verdict against the Malquists. In support of this proposition appellees cite 68 C.J.S. Partnership § 174. It discusses the contractual rights of a partnership and is inapposite as we are dealing here with a tort action. When the duty was breached, DeHoney was the member of a partnership. The breach of the duty caused a loss of partnership property. The partners were therefore proper parties.

■ The second issue raised by appellants is whether the trial court abused its discretion in setting aside their affidavits of default and entry of default as to the four named police officers, Sgt. Hernandez and Officers Hovis, Hill and Edwards. We find no abuse of discretion.

On September 22, 1975, appellants filed their original complaint, naming as defendants the City of Casa Grande and fictitious police officers and corporations. On October 1, 1975, Sgt. Hernandez and Officers

Hovis and Edwards signed affidavits acknowledging receipt of the summons and complaint, and acknowledging that the Casa Grande City Attorney accepted service on their behalf. Officer Hill signed an identical affidavit on October 2, 1975. The acceptance of service signed by the city attorney on September 30, 1975 says: "the undersigned does hereby accept service of Summons and Complaint for said defendants, City of Casa Grande, Members of the City Council, . . ." etc.

On October 9, the city's answer was filed. Pertinent portions of the answer state:

"As Defendant is unaware of the true identities of Defendants, Officer John Roe and Officer Richard Doe, therefore it cannot respond to any allegation concerning these individuals.

\*     \*     \*     \*     \*     \*

This answer shall be deemed adopted by any fictitious defendants who are subsequently served by process and who were in fact employees or agents of the answering defendant, THE CITY OF CASA GRANDE, on or about the 30th day of July, 1975."

At the pretrial conference on March 15, 1976, the court granted appellants leave to amend the caption of their complaint to reflect the true names of the officers. Appellants filed an amended complaint October 14, 1977.

On October 14, 1977 appellants also filed an affidavit on default and entry of default against Sgt. Hernandez and Officers Hill, Hovis and Edwards. The same day the two attorneys appeared before the trial court to argue a motion for leave to amend the complaint. They disclosed that up until the day before, all the attorneys connected with the case had either forgotten about or had never been aware of the acknowledgments of receipt of service signed by the four policemen two years before. Appellees' attorney had been prepared to argue that the statute of limitations had run as to the four policemen. Appellants' attorney contended that the policemen had been served but had never filed an answer. He argued that

because in the acceptance of service signed by the city attorney "defendants" is followed by a comma instead of a colon, "defendants" refers specifically to the four policemen. In addition, the answer filed by the city attorney was only on behalf of the city and any fictitious defendants *subsequently* served.

The superior court judge's solution was to find that the individual defendants had been served in a timely manner and that the answer filed by the city attorney was adequate on behalf of all the defendants. He therefore set aside the entry of default.

 Setting aside an entry of default is a matter within the sound discretion of the trial court. *Gray v. Dillon*, 97 Ariz. 16, 396 P.2d 251 (1964). In *Phillips v. Findlay*, 19 Ariz.App. 348, 507 P.2d 687 (1973) this court gave the criteria for setting aside a default judgment. The party seeking relief "must demonstrate to the satisfaction of the trial court (1) that his failure to answer within a time required by law was excusable neglect; (2) that he had a meritorious defense; and (3) that he made prompt application for relief." 19 Ariz.App. at 353, 507 P.2d at 692. Appellants concede that appellees could adequately show (2) and (3) but contend that they did not demonstrate excusable neglect. The question was not settled below whether there had been a failure to answer. Whether the trial court concluded that the answer filed was in fact on behalf of the four policemen or could be treated as if it had been their answer, we do not feel that the court abused its discretion.

In *Gray v. Dillon*, supra, the court quoted with approval from *Watson v. San Francisco & H. B. R. R. Co.*, 41 Cal. 17, 20:

" ' "The exercise of the discretion ought to tend, in a reasonable degree at least, to bring about a judgment on the very merits of the case; and when the circumstances are such as to lead the court to hesitate upon the motion to open the default, it is better as a general rule that the doubt should be resolved in favor of the application." ' " 97 Ariz. at 18, 396 P.2d at 252.

On this issue we affirm the ruling of the court below. The judgment in favor of the appellees is vacated and the cause remanded for a new trial.

HATHAWAY, J., and RICHMOND, C. J., concurring.