602 P.2d 21

Laura DUNBAR et al., Mary Wood, et al., Bernice Johnson, et al., Tharon Rawson, et al., Plaintiffs-Appellants,

v.

UNITED STEELWORKERS OF AMERICA, an Unincorporated Association, and State of Idaho, Defendants-Respondents.

Nos. 12228 to 12231.

Supreme Court of Idaho.

Sept. 13, 1979.

Rehearing Denied Nov. 23, 1979.

Bruce O. Robinson, Nampa, May, May, Sudweeks & Fuller, Twin Falls, Matthews, Lee & Wilson, Boise, Thomas A. Mitchell, Coeur d'Alene, Eli Rapaich, Lewiston, Cartwright, Saroyan, Martin & Sucherman, Inc., San Francisco, Cal., Philo, Maki, Cockrel, Robb, Spearman & Cooper, Detroit, Mich., Burgess, Joyce, Prothero, Whelan & O'Leary, Butte, Mont., and Lloyd J. Webb, of Webb, Burton, Carlson & Pedersen, Twin Falls, for plaintiffs-appellants.

Honorable Wayne L. Kidwell, Atty. Gen., Peter C. Jenkins, Sp. Asst. Atty. Gen., George H. Cohen, of Barr, Gottesman, Cohen & Peer, Washington, D. C., Eberle, Berlin, Kading, Turnbow & Gillespie, Chtd., Boise, Wayne P. Fuller, of Fuller & Radke, Caldwell, Michael E. McNichols, Orofino, David L. Gore, Chicago, Ill., Frederick V. Betts and Paul D. Carey, of Skeel, McKelvy, Henke, Evenseon & Betts, Seattle, Wash., and Kleiman, Cornfield & Feldman, Chicago, Ill., for defendants-respondents.

SHEPARD, Justice.

These are appeals from orders of summary judgment entered by the trial court in favor of both defendants, the United Steelworkers of America and the State of Idaho. As to the State, the court held that the activity upon which plaintiffs base their claim fell within the discretionary act exception to the Idaho Tort Claims Act. I.C. § 6–904. As to the Union, the court held that plaintiff's claim was preempted by the federal regulation of labor law. *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971). We affirm the trial court's order for summary judgment as to the State, but reverse the trial court's order of summary judgment as to the Union.

The Coeur d'Alene Mining District is located in northern Idaho near Kellogg and Wallace, Idaho. Therein are located a number of "hard rock" mines, the shafts in some of which extend 6,000 feet below the surface and some of which contain up to 125 miles of underground tunnels and workings. The Sunshine Mine is one of such workings and is the largest producer of silver and antimony in the United States. On May 2, 1972, some 200 miners were at work in the mine when a fire broke out which claimed the lives of 91 of those workmen. Survivors or deceased miners brought these actions for wrongful death, which were consolidated for appeal.

### I.

As to the Union, plaintiffs allege negligence on the part of the Union in that it undertook to act as accident prevention representative and enforcer of the "company-employees" agreement. It was asserted that the Union misrepresented its safety concern and expertise; that it failed to develop an adequate safety program for its members; that it undertook to inspect and enforce the accident prevention clauses of the company-employees contract and did so negligently in failing to require fire drills, personal protective equipment, adequate protection against spontaneous combustion, adequate emergency egress and failed to require evacuation on evidence of smoke.

For emphasis, we reiterate that this appeal is from the orders of summary judgment issued by the trial court solely on legal theories under which the character of the two defendants, the Union and the State, were held to bar plaintiff's recovery.

We begin our analysis with the argument advanced by the Union and adopted by the trial court, *i. e.,* the jurisdiction of the courts of Idaho to hear and adjudicate plaintiffs-appellants' claim against the Union is preempted and superseded by the pervasive federal regulation of labor law and that such matters are committed exclusively to the primary jurisdiction of the National Labor Relations Board.

In *Ray v. Atlantic Ritchfield Co.,* 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978), it is stated:

"The Court's prior cases indicate that when a State's exercise of its police power is challenged under the Supremacy Clause, 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" 435 U.S. at 157, 98 S.Ct. at 994.

*Quoting Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). The preemption of state law or of state court jurisdiction is not to be readily inferred. *Malone v. White Motor Corp.,* 435 U.S. 497, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978).

The primary philosophy of the United States Supreme Court in the labor law preemption area was announced in *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). There the Court said:

"In determining the extent to which state regulation must yield to subordinating federal authority, we have been concerned with delimiting areas of potential conflict; potential conflict of rules of law, of remedy, and of administration. * * * We have necessarily been concerned with the potential conflict of two

law-enforcing authorities, with the disharmonies inherent in two systems, one federal the other state, of inconsistent standards of substantive law and differing remedial schemes." 359 U.S. at 241–42, 79 S.Ct. at 778.

In some cases the desire to avoid the conflicts delineated in *Garmon* has led the Court to declare that some matters are committed exclusively to the primary jurisdiction of the National Labor Relations Board, and states, and *a fortiori* state courts, are without jurisdiction to regulate or hear the disputes. *Lodge 76, International Association of Machinists v. Wisconsin Employment Relations Comm'n,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976); *San Diego Bldg. Trades Council v. Garmon, supra.* In other cases, however, the Court has held that state courts have concurrent jurisdiction. *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Charles Dowd Box Co. v. Courtney,* 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962).

A substantial factor as to whether state courts are ousted from all jurisdiction or share concurrent jurisdiction appears to be whether the activity involved is "arguably subject to [paragraph] 7 or [paragraph] 8 of the [National Labor Relations] Act." *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. at 245, 79 S.Ct. at 780. In *Garmon* the Court stated:

"When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8 [29 U.S.C.A. § 158 (a)-(b)], due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law. Nor has it mattered whether the States have acted through laws of broad general application rather than laws specifically directed towards the governance of industrial relations. Regardless of the mode adopted, to allow the States to control conduct which is the subject of national regulation would create potential frustration of national purposes." 359 U.S. at 244, 79 S.Ct. at 779.

That language continues to be viable and has been quoted on several occasions since *Garmon.* See *Farmer v. United Brotherhood of Carpenters,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977); *Lodge 76, International Association of Machinists v. Wisconsin Employment Relations Comm'n, supra; Motor Coach Employees v. Lockridge, supra.*

It is the Union's position that the claims of plaintiffs-appellants are based on the breach of the duty of fair representation. *Humphrey v. Moore,* 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964). That being the case, the Unions argue, federal labor law must be applied even when the case is brought in state court. *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842. The Union's argument continues that the plaintiffs-appellants must show that the Union discriminated against the deceased Union members in order to prove a breach of the duty of fair representation, *Motor Coach Employees v. Lockridge, supra,* and since the plaintiffs-appellants have not made such a showing, summary judgment was properly entered in favor of the Union. We disagree. Plaintiffs-appellants' claims are not necessarily based on the violation of the duty of fair representation and such is not the only duty owed by a union to its members. Further, we believe that even assuming the claims of plaintiffs-appellants fall within the general scope of the doctrine of preemption, nevertheless we deem it clear that the case also falls within the narrow exceptions to that same preemption doctrine which were described in *Farmer v. United Brotherhood of Carpenters,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977).

The duty of fair representation has never been carefully or precisely defined and its contours appear vague but, a fair summation of it is that it is designed "to enforce fully the important principle that no indi-

vidual union member may suffer invidious, hostile treatment at the hands of the majority of his coworkers." *Motor Coach Employees v. Lockridge,* 403 U.S. at 301, 91 S.Ct. at 1925. *See* Clark, *The Duty of Fair Representation: A Theoretical Structure,* 51 Tex.L.Rev. 1119 (1973); Cox, *The Duty of Fair Representation,* 2 Vill.L.Rev. 151 (1957); Rosen, *Fair Representation, Contract Breach and Fiduciary Obligations: Unions, Union Officials and the Worker in Collective Bargaining,* 15 Hastings L.J. 391 (1964).

In *Steele v. Louisville & N. R.R.,* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), the Court held that the exclusive statutory agent of bargaining unit employees could not discriminate on the basis of race. The Court stated:

"Unless the labor union representing a craft owes some duty to represent non-union members of the craft, at least to the extent of not discriminating against them as such in the contracts which it makes as their representative, the minority would be left with no means of protecting their interests, or indeed, their right to earn a livelihood by pursuing the occupation in which they are employed. While the majority of the craft chooses the bargaining representative, when chosen it represents, as the Act by its terms makes plain, the craft or class, and not the majority. The fair interpretation of the statutory language is that the organization chosen to represent a craft is to represent all its members, the majority as well as the minority, and it is to act for and not against those whom it represents.
\* \* \*

We think the Railway Labor Act imposes upon the statutory representative of a craft at least as exacting a duty to protect equally the interests of the members of the craft as the Constitution imposes upon a legislature to give equal protection to the interests of those for whom it legislates. Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it

represents, cf. *J.I. Case Co. v. National Labor R. Board,* [321 U.S. 332, 335, 64 S.Ct. 576, 88 L.Ed. 762], but it has also imposed on the representative a corresponding duty. We hold that the language of the Act to which we have referred, read in light of the purposes of the Act, expresses the aim of Congress to impose on the bargaining representative of a craft or class of employees the duty to exercise fairly the power conferred upon it in behalf of all those for whom it acts, without hostile discrimination against them."

323 U.S. at 201–03, 65 S.Ct. at 231–232. *See Vaca v. Sipes, supra; Wallace Corp. v. National Labor Relations Bd.,* 323 U.S. 248, 65 S.Ct. 238, 89 L.Ed. 216 (1944).

The duty of fair representation has been extended to other forms of arbitrary discrimination beyond that of race alone, but insofar as we are cited authority, the duty of fair representation retains its fundamental character as a protection against invidious discrimination by the majority of a bargaining unit against a minority. *Motor Coach Employees v. Lockridge, supra; Humphrey v. Moore, supra.* We are cited to no authority which indicates that the duty of fair representation encompasses or displaces those duties created by a state law which requires a person, corporation or an unincorporated association, to refrain from engaging in wrongful conduct which results in death or injury to person or property.

■ The Union here urges that the "only" duty owed by a union to those it represents is that of fair representation. We disagree. We are cited to no authority, for example, which insulates a union for its negligent and tortious conduct toward one of its members, *i. e.,* if a member of a union was struck by a motor vehicle owned by the union and operated by one of its officials during the course of his employment for the union, we cannot believe the union would be insulated from liability on the basis that the only duty it owed toward its members was that of fair representation. If a union's unreasonable conduct results in the

death of one of its members, it should not be excused from liability because of the legal fortuity of its organizational status anymore than if its conduct brought death to a nonunion member.

The Union urges the application of the decision of *House v. Mine Safety Appliances Co.,* 417 F.Supp. 939 (D.Idaho 1976), decided by the United States District Court for Idaho, arising out of the same Sunshine Mine tragedy. That federal court relied in part upon the very trial court decision which is the subject of this appeal. We are not bound by the federal court's determination and its decision is, at best, only persuasive.

The court in *House* advanced another reason for its determination that the negligence action was preempted. It relied upon *Bryant v. United Mine Workers,* 467 F.2d 1 (6th Cir. 1972), *cert. denied,* 410 U.S. 930, 93 S.Ct. 1370, 35 L.Ed.2d 592 (1973). *Bryant* was also a case in which suit was brought by survivors of miners killed in a mine disaster. There the survivors claimed that the union had breached a duty created by the collective bargaining agreement regarding mine safety. In *Bryant* the collective bargaining agreement stated that the union "may inspect any mine." In affirming that judgment in favor of the defendants, the Court of Appeals stated that "[t]he use of the permissive 'may' rather than obligatory language in the clause clearly negatives the possibility that any duty was to be created." 467 F.2d at 5. As noted by the federal district court in *House,* the agreement in the case at bar uses the words "shall inspect."

■ We hold that material issues remain in existence in the case at bar regarding whether the Union had a duty to inspect and whether it breached that duty. In the case at bar these questions were never reached since the trial court held that the cause of action was preempted by the federal duty of fair representation. This case, therefore, is clearly distinguishable from *Bryant.*

We believe the interests protected by state wrongful death statutes are unrelated to those governed by federal labor laws and we ascertain no conflict which will necessarily arise between the state and federal authorities as a result of permitting such traditional litigation in the state courts. We are cited to no authority which would permit the National Labor Relations Board to take cognizance of wrongful death claims against unions. We are cited to no authority holding that it may be fairly inferred that Congress meant to deprive the states of their powers of determining litigation brought under state wrongful death statutes. *See Helton v. Hake,* 386 F.Supp. 1027 (W.D.Mo.1974); W. Prosser, Law of Torts § 127 (4th ed. 1971).

■ We now turn to the assumption that preemption in a general term might apply notwithstanding the above discussion. We are of the opinion that even if the doctrine of preemption should apply in general terms, nevertheless this case falls within those exceptions to the doctrine of preemption previously announced by the United States Supreme Court. *See Farmer v. United Brotherhood of Carpenters,* 430 U.S. at 296–301, 97 S.Ct. 1056. In *Farmer* a state claim was asserted by a union member against the union for the infliction of severe emotional distress by intentional and outrageous conduct. The Court in *Farmer* held that such was an exception to the preemption rule. Other activities which the Supreme Court has determined to be exceptions to the general preemption rule include malicious libel, *Linn v. Plant Guard Workers,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966); mass picketing and threats of violence, *United Automobile Workers v. Russell,* 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958); and wrongful expulsion from union membership, *Machinists v. Gonzales,* 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958). *See also Sears Roebuck v. San Diego County Dist. Council of Carpenters,* 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978).

As noted in *Farmer,* exemptions or exceptions to the preemption doctrine should reflect an inquiry into the nature of the federal and state interest in regulation and the

potential for interference with federal regulation or whether the potential for conflict with the federal scheme is "tangential and remote." Here the federal interest is tangential at best. And we see no possibility that the federal labor laws will be thwarted by requiring the Union to answer in state court to the claim that it wrongfully caused the death of these survivors' decedents.

We reverse the summary judgment of the district court as to the respondent Union and remand that portion of the cause for further proceedings.

## II.

■ Plaintiffs' claims against the State of Idaho are brought under the provisions of I.C. § 6–904, which is denominated the Idaho Tort Claims Act and is a legislative waiver of the State's otherwise sovereign immunity. It was and is the assertion of the State and summary judgment was granted the State on the basis that plaintiffs' claims were barred by that portion of I.C. § 6–904 which provides that the State shall not be liable for any claim arising out of or "based upon the exercise of performance or failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused."

At the time of the accident and the time of the filing of this action, the Idaho statutes provided for the office of Inspector of Mines for the State of Idaho. That official was required to visit each mine in the State of Idaho at least once each year for the purpose of determining the conditions as to safety and health and to promulgate reasonable rules and regulations for safety and health of employees therein after consultation with the State Mine Safety Advisory Board. [Those statutes, I.C. § 47–101, et seq., were appealed and the same duties essentially transferred to the Department of Labor and Industrial Services and the Director thereof. 1974 Idaho Sess.Laws, Chapters 39 and 119, now codified as I.C. §§ 44–101, et seq.] Those statutes also authorized the inspector to enter mines to inspect for compliance with safety regulations and to notify the operator thereof of any violations. The statute required the operator to correct conditions of noncompliance and failing to do so, the inspector might issue an order closing the mine or portions thereof. General sanctions could be applied for failure of compliance with such orders.

At the time of the fire, there was in effect, adopted December 1971 Minimum Safety Standards and Practices for the Mining and Mineral Industry. [Safety Code 5]. Portions of that Safety Code 5 relevant to our consideration here are:

Paragraph 2:3 of this code provides as follows:

"In this code numerous general expressions are used, such as safe, adequate, substantial, proper, etc., particularly in reference to safeguards. By such terms it is the intention to specify available articles and attainable conditions in accordance with good standard practice in the industry and to avoid makeshifts. In the first instance the determination of what is reasonable, safe, adequate, substantial, etc., is the *prerogative* of the inspecting official. In making such determination, the inspector must consult and consider the standards fixed or approved by recognized authorities, or applicable Idaho State Safety Codes, which are not in conflict with the regulations set forth herein.

"In cases of doubt or involving dispute, the advisory services of the State Inspector of Mines are available. Where time permits, approval by him of new or untried devices should be sought in advance." (Emphasis added.)

Regulation 2:4(A) reads as follows:

"When compliance with any of the provisions of this code appears impracticable or unreasonable the State Inspector of Mines may, upon application in writing, permit modifications of the requirements when protection substantially equivalent to that required by this code has been provided. Such application shall set forth in full detail the reasons for requesting

such modification. Any modification granted shall be limited to the particular case covered by the application for modification. Authorization for modification shall be in writing and shall be on file at the property with respect to such modification as allowed. Any such modification shall be revocable after due and reasonable notice in writing to the employer."

Plaintiffs-appellants asserted liability of the State in that it "undertook, pursuant to the Idaho statutes, to inspect and enforce safety in the aforementioned mine and failed to enforce an elementary accident prevention program * * *" by failing to require fire drills, safety meetings, mine evacuation upon discovery of smoke, adequate personnel protective equipment and adequate emergency means of escape. Plaintiffs-appellants also asserted negligence in that the Governor allegedly failed to give adequate chief executive supervision and direction to the State Mine Inspector; that the Governor was negligent in approving the appointment of a mine inspector who lacked the necessary qualifications to adequately handle the office; that the mine inspector and his deputies were negligent in inspecting the mine in accordance with Safety Code 5 in the above and additional matters.

Upon motion therefor the district judge granted summary judgment in favor of the State holding that the acts alleged and asserted by plaintiffs-appellants fell within the purview of the discretionary act exemption to the Idaho Tort Claims Act.

That portion of the Idaho Tort Claims Act exempting from liability "a discretionary function or duty" has not been previously construed by this Court. That language, however, was clearly adopted from the federal Tort Claims Act, 28 U.S.C. § 2680(a) (1970). The interpretation and construction of a federal act by federal courts, while not binding, is persuasive. *Southern Idaho Pipe & Steel Co. v. Cal-Cut Pipe & Supply Co.,* 98 Idaho 495, 567 P.2d 1246 (1977); *State v. Miles,* 97 Idaho 396, 545 P.2d 484 (1976).

The first significant interpretation of the discretionary act exemption under the federal statute was announced in *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). That case arose from a fire and explosion in a Texas port which killed more than 500 persons. The disaster resulted from a federal government decision to produce and export a highly volatile fertilizer. The Court interpreted the legislative history of the act and concluded that the government should not be subject to liability arising from acts of a governmental nature or function. The Court further said:

"It is enough to hold, as we do, that the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable." 346 U.S. at 35–36, 73 S.Ct. at 968. (Footnote omitted.)

Three members of the Court dissented in *Dalehite.* Thus, with two members of the Court not participating, the decision resulted in a 4–3 split of the sitting members of the Court.

The majority opinion states "[S]ince no individual acts of negligence could be shown, the suits for damages that resulted necessarily predicated government liability on the participation of the United States in the manufacture and the transportation of FGAN [ammonium nitrate fertilizer]." 346 U.S. at 23, 73 S.Ct. at 961. However, as pointed out, specific allegations of negligence on the part of the government were asserted by plaintiffs, *i. e.,* that the material was an inherently dangerous and hazardous explosive and fire hazard; that a coating rendered the material highly susceptible to fire or explosion; that the material was placed in bags which were easily ignited by

contact with fire or by spontaneous combustion; that the material was packed at high degrees of temperature which rendered the material more susceptible to fire and explosion; that said high temperature continued by reason of the method of packaging while the material was shipped; that the sacks of the material were not labeled or marked as explosive and as a fire hazard as required by the rules and regulations of the Interstate Commerce Commission; and that common carriers of the material were not advised of the dangerous nature and character of the material.

As well pointed out by the dissent, "The fertilizer had been manufactured in Government-owned plants at the Government's order and to its specifications. It was being shipped at its direction as part of its program of foreign aid." 346 U.S. at 48, 73 S.Ct. at 974 (Jackson, J., dissenting). Hence, we note that the manufacturing operation was operated and controlled by the government entity sought to be held liable, and the product resulting from said operation was placed into commerce by the government. Further, we note that the manufacture, packaging and shipping of a fertilizer product is not an activity completely foreign to the sector of private business as contrasted with a governmental activity for which there is no corollary in the private sector.

The majority opinion nevertheless comments on "the specific acts of negligence" and argues that each of the specific acts was the result of some "discretionary" determination and thus could not constitute negligence. With all respectful deference to our brethren on the high Bench, we suggest that such reasoning or terminology provides no realistic answer as to what constitutes a "discretionary function." It seeks to insulate the government from liability for specific acts of negligence by stating that the decision to be negligent or careful involves discretion, and hence the negligence is not actionable. Such treatment provides no answer to the question of whether a duty was owed which was breached and which resulted in damage to another.

As we deem well said by the dissent:

"The Government, as landowner, as manufacturer, as shipper, as warehouseman, as shipowner and operator, is carrying on activities indistinguishable from those performed by private persons. In this area, there is no good reason to stretch the legislative text to immunize the Government or its officers from responsibility for their acts, if done without appropriate care for the safety of others. Many official decisions even in this area may involve a nice balancing of various considerations, but this is the same kind of balancing which citizens do at their peril and we think it is not within the exception of the statute.

The Government's negligence here was not in policy decisions of a regulatory or governmental nature, but involved actions akin to those of a private manufacturer, contractor, or shipper. Reading the discretionary exception as we do, in a way both workable and faithful to legislative intent, we would hold that the Government was liable under these circumstances." 346 U.S. at 60, 73 S.Ct. at 980 (Jackson, J., dissenting).

In an appropriate case involving the Idaho Tort Claims Act, we would undoubtedly be constrained to agree with the dissenters in *Dalehite* on the basis that the manufacturing operation was carried out by the government and the product was the result of that manufacturing operation as was the packaging and the shipment and the placing of the product into the stream of commerce; the activity carried out by the government was "akin to those of a private manufacturer, contractor, or shipper." *Id.*

In what was perhaps dictum, the majority in *Dalehite* also held that an allegation of negligence on the part of the government in fighting the fires which resulted from the explosion did not support a cause of action, citing *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950).

A scant two years later the dissenters of *Dalehite* appear to have prevailed in *Indian Towing Co. v. United States,* 350 U.S. 61, 76

S.Ct. 122, 100 L.Ed. 48 (1955). There liability was sought to be imposed on the government for negligent failure to maintain a lighthouse with the result that a ship and barge went aground and were damaged. The Court in a relatively short opinion bottomed its opinion on the "Good Samaritan" theory and said:

"The broad and just purpose which the statute [Tort Claims Act] was designed to effect was to compensate the victims of negligence in the conduct of governmental activities in circumstances like unto those in which a private person would be liable * * *." 350 U.S. at 68, 76 S.Ct. at 126.

The Court held neither *Feres* nor *Dalehite* applicable to the decision in *Indian Towing*, stating only, "The differences between this case and *Dalehite* need not be labored. The governing factors in *Dalehite* sufficiently emerge from the opinion in that case." 350 U.S. at 69, 76 S.Ct. at 127 (footnote omitted.).

Again, with all deference, we cannot accept the rationale of the majority opinion in *Indian Towing*. While the activity or lack of activity which allegedly caused the damage involved a facility which was government owned and operated, we cannot agree that there is or could be a parallel between the government being held to the same liability as a private person since, as pointed out, all but the government are expressly prohibited from maintaining lighthouses.

With some language of the Court in *Indian Towing*, we are however, in total agreement, to-wit: that the "discretionary act" exemption to the Tort Claims Act invites the drawing of "distinction so finespun and capricious as to be almost incapable of being held in the mind for adequate formulation." 350 U.S. at 68, 76 S.Ct. at 126.

Less than two years thereafter the Court by a 7-2 majority delivered an opinion in *Rayonier, Inc. v. United States*, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957). There the United States owned certain land through which it permitted a railroad to operate, and as a result thereof a forest fire was ignited which was fought by forest service personnel. It was alleged that the fire was improperly controlled and thus damaged the plaintiffs. Although not clear, it is probable that those portions of *Dalehite* and *Feres* dealing with immunity from the negligence of firefighters were overruled. Again, we note that the facility involved was owned, controlled and operated by the government and the negligence which was the immediate cause of the damage without any intervening factors was that of government employees. As in *Indian Towing*, the Court in *Rayonier* made no substantial effort to define the scope of the "discretionary act" exemption to the Tort Claims Act, other than obviously negligent fighting of fires by government employees is not within the ambit of the exception.

It was said in the *Dalehite* dissent:

"This is one of those cases that a judge is likely to leave by the same door through which he enters. As we have been told by a master of our craft, '*Some* theory of liability, some philosophy of the end to be served by tightening or enlarging the circle of rights and remedies, is at the root of any decision in novel situations when analogies are equivocal and precedents are silent.'" 346 U.S. at 49, 73 S.Ct. at 975. (Jackson, J., dissenting) (Footnote omitted).

So it is with our reading of those decisions of the United States Supreme Court in the area of "discretionary act exemption." We leave them no wiser and find no clear theory or philosophy as to the meaning or application of the "discretionary act" exemption to the Tort Claims Act which is common to the federal and Idaho legislation.

We have reviewed decisions of the lower federal courts dealing with the discretionary function as an exemption to liability otherwise imposed by the federal Tort Claims Act. Such review also fails to engender assistance in the areas of either legislative intent or policy guidelines.

*Martin v. United States*, 546 F.2d 1355 (9th Cir. 1976), was an action under the federal Tort Claims Act based on a death

resulting from a grizzly bear attack in Yellowstone National Park. The Court therein concluded, as in *Dalehite,* that a decision as to the administration of the park area which might result in grizzly bears invading camp ground areas was a high level policy determination which fell at the planning level, rather than the operational level. The Court in *Martin* also found no credible evidence that the government had failed to warn of a dangerous condition, which appears to have been the sole possible source of liability of the government. Such may explain in part that court's willingness to find that the government's activities were at the planning level, therefore discretionary and therefore exempt from the tort claims coverage. Nevertheless, we would undoubtedly disagree with that court's finding as it relates to the discretionary function. Although Yellowstone Park is admittedly a vast expanse of land and animals, it is not substantially different in its nature than wild animal parks which might be operated by private persons or entities. The decedent might have been construed to be an invitee. Hence, we see no reason not to apply the same standard of care to the government as we would apply to such an enterprise operated by non-government persons. In the context of the management of a privately owned business, we would undoubtedly hold that the fact that a decision was made by a high level corporate officer on a planning level, rather than by a relatively low level animal trainer employee in his day-to-day operations, would be irrelevant. As to the existence of a duty between the owners or operators of a facility and an invitee, we would undoubtedly hold for a plaintiff and the existence of a duty.

In contrast to *Martin,* less than one year later the same Ninth Circuit decided *McGarry v. United States,* 549 F.2d 587 (9th Cir. 1976). That claim resulted from the death of an employee of a company under contract with the government to drill exploratory holes on an Atomic Energy Commission test site. While so working, the equipment struck electrical wires and the employee was killed. It was there argued that the decision to install automatic reclo-

sure on the electrical lines, which resulted in decedent's death, was a planning level decision, as contrasted with an operational decision, and, therefore, constituted a discretionary function, exempting liability under the Tort Claims Act. In *McGarry* the court noted, "We find no error in imposing this duty of care under the circumstances of this case. The power line was owned by the United States. It was to be contemplated that contractors would engage in work in its neighborhood, and the AEC here was aware of the location of the exploratory hole." 549 F.2d at 590. If presented with a *McGarry* situation, we would undoubtedly hold the government duty no different than that owed in the private sector. We would not be concerned with the level at which the decision might be made as to the operation of power lines, but rather whether there had been a breach of duty to persons who could reasonably be expected to be in the vicinity of a power line.

In *J. H. Rutter Rex Manufacturing Co. v. United States,* 515 F.2d 97 (5th Cir. 1975), suit was filed for damages resulting to the plaintiff by reason of an unreasonable delay by the National Labor Relations Board in closing a back pay labor dispute case. The court in a brief and cryptic opinion decided that the decision of the NLRB "clearly involved public policy considerations—balancing of various cost-benefit considerations to advance the public interest." 515 F.2d at 99. There could be drawn from *Rutter* the seminal thread leading to argument that the government should not be liable as a result of activities for which there is no parallel in the private sector and Tort Claims Acts were designed to provide liability as to the government only when a comparable liability and duty would exist in the private sector. Such, however, is not expressly discussed in the *Rutter* opinion.

*Smith v. United States,* 375 F.2d 243 (5th Cir. 1967), was also a decision of the Fifth Circuit. Smith sat as a juror in a federal court civil rights damages suit. He alleged that as a result of his service on the jury and their verdict, civil rights groups conspired against his business and the picket-

ing and boycott resulting therefrom destroyed his business. He alleged that the failure of the government to arrest and/or prosecute those persons for the crime of intimidation of a federal juror resulted in the accrual of a cause of action against the government. The court in Smith appears to reject the planning-operational dichotomy in determining whether the function performed is "discretionary" under the Tort Claims Act. The court said:

"Cases under the Act therefore put courts to the question of what sorts of decisions can be classified as resulting from discretion within the meaning of § 2680(a). It is not a sufficient defense for the government merely to point out that some decision-making power was exercised by the official whose act was questioned. Answering these questions, a difficult process, is not aided by importation of the planning stage-operational stage standard as argued for by Smith. Such a distinction is specious. It may be a makeweight in easy cases where of course it is not needed, but in difficult cases it proves to be another example of a distinction 'so fine spun and capricious as to be almost incapable of being held in the mind for adequate formulation.'" 375 F.2d at 246.

The Court in Smith implicitly appears to be saying that where certain functions of government have no parallel in the private sector "an official exerts governmental authority in a manner which legally binds one or many, he is acting in a way which no private person could." (Jackson, J., dissenting in Dalehite.) The discretionary function exemption prevents the diffusion of governmental power into private hands. The Court in Smith went on to say:

". . . The discretion of the Attorney General in choosing whether to prosecute or not to prosecute, or to abandon a prosecution already started, is absolute.

\* \* \* \* \* \*

The national wellbeing has been in the balance during the recent struggle for racial equality, of which the present action is a piece. The federal government's

decisions concerning enforcement of its criminal statutes comprise a part of its pursuit of national policy. If the government could be held liable for prosecuting or failing to prosecute such a case, its choices in this area could quite conceivably be affected by such a suit. Thus, a policy decision of the federal government might be influenced by a plaintiff with no governmental responsibility." 375 F.2d at 247.

The case of United States v. DeCamp, 478 F.2d 1188 (9th Cir. 1973), is similar in some respects to McGarry v. United States, supra, however, with important distinctions. In DeCamp action was brought under the Tort Claims Act for a death occurring while decedent was the employee of a company under contract with the Army Corps of Engineers. He was a bulldozer operator who was killed as a result of the absence of a canopy on the bulldozer which would otherwise have prevented his death. The court approved a lower court finding of non-negligence of the employer for failure to equip the tractor with a canopy. The court stated:

"In California a private person would assume no tort duty by reaching this conclusion [not to equip tractors with canopies] and the government engineer cannot be held to a higher standard." 478 F.2d at 1193.

Although Estrada v. Hills, 401 F.Supp. 429 (N.D.Ill.1975), was an action brought against federal officials rather than the United States Government, we deem the language to be indicative of the groping by the courts in interpreting the discretionary function exemption to the Tort Claims Act. There it was alleged that the federal officials had maintained a building in hazardous condition which led to a fire and caused the plaintiff's adjacent building to be destroyed. The court said:

". . . One source of guidance useful here, however, is the explanation of the discretionary-ministerial distinction developed in the context of the Federal Tort Claims Act. \* \* \* Generally speaking, a duty is discretionary if it in-

volves judgment, planning or policy decisions. It is not discretionary if it involves enforcement or administration of a mandatory duty at the operational level, even if some degree of professional expert evaluation is required. [Citations omitted.] The key is whether the duty is mandatory, and whether the act complained of involved policy-making or judgment. For example, negligence in the construction of a government facility is nondiscretionary and subjects the Government to liability under the Federal Tort Claims Act. [Citations omitted.] On the other hand, the Government is not liable under the Federal Tort Claims Act for actions based on the exercise of discretion, even if that discretion is abused." 401 F.Supp. at 436. ·

One of the more often cited cases is *Eastern Air Lines, Inc. v. Union Trust Co.*, 95 U.S.App.D.C. 189, 221 F.2d 62 (D.C.Cir. 1955), (*affirmed Per Curiam*, 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 799.) There it was alleged that negligent instructions given by air traffic controllers who were federal employees resulted in the crash of a military plane and an airliner. The court recognized that the principal question presented was whether the United States had consented to be sued for negligence of its control tower employees in regulating air traffic. The court noted as follows:

"The government insists that its tower operators perform governmental functions of a regulatory nature; that no private individual has such power of regulation; that therefore the Act does not permit suit based on negligent performance of their duties. The situation involved here, says the Government, when viewed in all the circumstances, 'cannot be equated to one which would predicate analogous private liability,' and so it is said the claims are excluded from the coverage of the Tort Claims Act." 95 U.S.App.D.C. at 200, 221 F.2d at 73.

The court went on to point out that it saw no reason why a private individual could not construct an airport and operate a control tower much as operated in the instant case, and that such an individual would, of course, be liable for the negligence of privately employed tower operators. Therefore, when the United States assumed a role parallel to that of private persons, it is liable for its negligent acts and omissions. The Court in *Eastern Air Lines* had little problem in finding that if the question was controlled by an operational-planning distinction, the duties performed were operational and stated:

"It is therefore our opinion that, if a Government towerman negligently clears two planes to land on the same runway at the same time, or is guilty of some other negligent act or omission in doing his work, the Government is liable for resulting injury in the same manner and for the same reason that it is liable for injury done by the driver of a mail truck who, in exercising discretion as to how to drive, negligently runs through a red traffic light." 95 U.S.App.D.C. at 205, 221 F.2d at 78.

The case of *Downs v. United States*, 522 F.2d 990 (6th Cir. 1975), is virtually impossible to reconcile with the case of *Smith v. United States, supra.* In *Downs* the claims resulted from the hijacking of a small passenger airplane. FBI agents refused to allow refueling when the plane landed and shot out one of the aircraft's engines. The hijacker thereupon shot and killed the two occupants of the plane and then himself. The court affirmed the trial court holding that the actions of the FBI agents did not fall within the purview of the discretionary act exemption. The court rejected the planning level versus operational level analysis and stated:

"We believe that the basic question concerning the exception is whether the judgments of a Government employee are of 'the nature and quality' which Congress intended to put beyond judicial review. [Citations omitted.] Congress intended 'discretionary functions' to encompass those activities which entail the formulation of governmental policy, whatever the rank of those so engaged. We agree with a commentator's analysis of the provision:

It would seem that the justifications for the exception do not necessitate a broader application than to those decisions which are arrived at through an administrator's exercise of a quasi-legislative or quasi-judicial function. [Developments in the law-remedies against the United States and its officials. 70 Harv.L.Rev. 827 (1957).]

The court further stated:

"The proper approach is to consider the precise function at issue, and to determine whether an officer is likely to be unduly inhibited in the performance of that function by the threat of liability for tortious conduct. * * * The prospect of government liability for the actions of law enforcement officers should not cause those officers less vigorously to enforce the law. The need for compensation to citizens injured by the torts of government employees outweighs whatever slight effect vicarious government liability might have on law enforcement efforts." 522 F.2d at 998.

We suggest that the Court's characterization of the actions of the government employees in *Downs* as being tortious dictates the result which is to be achieved by balancing the interest of individuals which have sustained damages as against the possibility of inhibition of governmental activity. We suggest that such a balancing test sheds no light on whether or not a duty existed running from the government to the injured citizens, the violation of which resulted in the legal determination that a "tort" had been committed which could result in liability.

The case of *Griffin v. United States*, 500 F.2d 1059 (3d Cir. 1974), is a case frequently cited in this field. That action involved the claim of a woman who became a quadriplegic as a result of ingesting live virus polio vaccine. An action had been brought against the pharmaceutical manufacturer and settled prior to the *Griffin* claim against the government. It was alleged that the Division of Biologic Standards of HEW had subjected the polio vaccine to testing for safety in potency and approved it for release to the public in a manner inconsistent with and in violation of agency regulations. It was argued that the ingested vaccine was in a lot which was tested and found to exceed the permissible levels of neurovirulence. That lot of vaccine was, nevertheless, released and approved because the agency reasoned that the unfavorable test results were not produced by defects in the vaccine sample tested, but rather the product of unusual characteristics of the particular monkeys innoculated with the vaccine. Such theory of "biological variation" resulted in discounting or disregarding as not significant what otherwise appeared to be excessive neurovirulence. The Court said:

"The fact that judgments of government officials occur in areas requiring professional expert evaluation does not necessarily remove those judgments from examination of courts by classifying them as discretionary functions under the Act. * * * This court is fully capable of scrutinizing the processes and conclusions of the decision-maker by the usual standards applied to cases of professional negligence." At 1066–67.

The majority opinion in *Griffin* concludes its discussion of the discretionary act exemption by stating:

"Liability, in such cases, is predicated not on a negligent or unwise policy determination, but on the failure of Government employees to conform to and act consistently with the authority delegated. We do not hold that the Government may be liable for policy determinations made by its officials. Rather, we hold only that the Government may be liable where its employees, in carrying out their duties, fail to conform to pre-existing statutory and regulatory requirements." At 1069.

The dissenting opinion points out that the decision of the agency to release the vaccine may well have resulted from the exercise of a discretion permitted within the scope of the agency regulation and, therefore, was not in violation as contended by the majority.

Nevertheless, *Griffin* appears, implicitly at least, to be based on the planning level-operational level standard since the majority virtually concedes that if the regulations governing the testing of the vaccine had been followed, such would constitute a planning level decision and fall within the discretionary function exemption. Of further interest in the *Griffin* decision is the court's holding that *Mahler v. United States*, 306 F.2d 713 (3d Cir. 1962), is distinguishable *since Mahler was based on negligence.*

Again, we note that *Griffin* appears unconcerned with the concept of tortious liability, but rather the imposition of liability when the government fails in some degree in its efforts to protect its citizenry and society in general by regulating and circumscribing the conduct of those who offer products or services to society.

In *First National Bank in Albuquerque v. United States*, 552 F.2d 370 (10th Cir. 1977), plaintiffs relied on *Griffin*. The case involved the claim on behalf of four children who had eaten pork which had been fed grain treated with a mercury fungicide. The children permanently lost sight, speech, locomotion and use of hands. It was alleged that the government had inadequately tested and investigated the fungicide and failed to prohibit the use of the fungicide and failed to require labeling of the danger of food chain poisoning on the fungicide packaging.

The Court purports to agree with the *Griffin* case, however, it held that the discretionary function exception applied. The Court held that the labeling, warnings, precautions and directions for use required policy judgments in evaluating the adequacy of the labeling and thus involved only a generalized protection of the public safety. As to the government's authority to suspend or cancel the products registration, the Court said only:

> "Whether such discretion is exercised and possibly abused, or whether there is a failure to exercise the discretion, such acts or omissions related to the cancellation function are within the terms of the exception provided by § 2680(a)." At 377.

*See also* cases collected in Annot., 99 A.L. R.2d 1016 (1965).

Although the above review of decisions of the lower federal courts is not complete or exhaustive, we deem it sufficient to demonstrate a lack of coherent doctrine or rationale. We gain nothing by way of assistance to our analysis.

The decisions of the courts of our sister states likewise provide no guidance or assistance. Those decisions furnish nearly as many rationales and/or theories as there are jurisdictions.

In *State v. Abbott*, 498 P.2d 712 (Alaska 1972), the Alaska court held that a judgment against the state should be affirmed when the alleged negligence of the state was failure to remedy a slippery highway during the winter time. That court concluded that such was within the ambit of an operational rather than a planning level decision and thus the state was not immune from liability under the discretionary act exception to the tort claims act. The same rationale was utilized in *State v. I'Anson*, 529 P.2d 188 (Alaska 1974), wherein it was alleged the state was negligent in failing to place warning signs and no passing zone striping on the highway, and the plaintiff sustained injury in a collision by reason thereof. In *Adams v. State*, 555 P.2d 235 (Alaska 1976), plaintiffs brought suit for death and injuries resulting from a fire in a hotel which had allegedly been negligently inspected and/or which the state and/or the municipality had negligently failed to close because of fire hazards. The Alaska court refused to apply the planning-operational dichotomy of *Dalehite*, but rather decided the case in favor of the plaintiff on "policy implications" and rejected the argument that such would be a wrongful intrusion by the judiciary into other branches of government. (*See*, however, the dissent of Conner, J. *See also* Alas.Stat. § 09.65.070(d)(1)(A), wherein claims against municipalities could not thereafter be based on the failure to inspect, discover a violation or abate a violation.) *See also State v. Morris*, 555 P.2d

1216 (Alaska 1976), wherein plaintiff was denied recovery against the state on the basis of immunity when the decedent fell from a bridge which his employer was constructing for the State of Alaska and the state had negligently failed to require the contractor to use safety equipment; and *Jennings v. State*, 566 P.2d 1304 (Alaska 1977), where the state was held immune from liability for the death of a school girl attempting to cross a highway and it was alleged that the state had been negligent in failing to provide a safe crossing point.

In *Nerbun v. State*, 8 Wash.App. 370, 506 P.2d 873 (1973), action was brought against the state for wrongful death resulting from the alleged negligence of the state in failing to enforce safety standards. There the court in denying liability said:

"We do not believe the legislature intended to impose an absolute duty upon the Department of Labor and Industries to insure a safe place for workmen to be employed. The most the legislature intended was that the Department prescribe safety standards and secure some reasonable compliance through spot check inspections. In this way the safety conditions for workmen in general would be improved. The relatively small staff provided for the Department is indication of this legislative intent. The situation is akin to those cases where a city is not held liable because the police department and its officers failed to enforce an ordinance." 506 P.2d at 877.

In *Loger v. Washington Timber Products, Inc.*, 8 Wash.App. 921, 509 P.2d 1009 (1973), the *Nerbun* decision was approved, the discretionary act exemption was discussed and liability denied. *Loger* was also a claim against the state for alleged negligence in performing safety enforcement functions. Such impelled the court to discuss "where, in the area of governmental processes, orthodox tort liability stops and the act of governing begins . . ." 509 P.2d at 1013.

In *Campbell v. City of Bellevue*, 85 Wash.2d 1, 530 P.2d 234 (1975), however, the liability of a municipality was upheld when an inspection disclosed a highly dangerous electrical condition on private property, but service to that property was not disconnected. Decedent was killed when she fell in a water body electrified by faulty wiring. Both *Nerbun* and *Loger* were distinguished on the basis that in *Campbell* an inspection had been carried out and the dangerous condition known by the municipality. It was further pointed out that if the state had been negligent in carrying out its duties, a state statute would have exempted it from liability. Nevertheless, the fact that a municipality attempted to exempt itself by ordinance was held not relevant.

In *Walters v. Hampton*, 14 Wash.App. 548, 543 P.2d 648 (1975), the victim of a shooting brought an action against the city based on the negligence of the city in failing to protect him from a person with known proclivities for violence with firearms. The court held that the decision to prosecute was discretionary and thus fell within the exception to liability. The court said:

"Furthermore, the amount of protection afforded by any individual police department is necessarily determined by the resources available to it. The determination of how these resources can most effectively be used is a legislative-executive decision. Were we to hold a police chief's failure to prosecute every alleged violation of a city ordinance exposes a municipality to civil liability in tort, we would be placing ourselves in a position of having to determine how limited police resources are to be allocated. [Citations omitted.] This is neither a traditional nor appropriate role for the courts to assume." 543 P.2d at 651.

The above case should be contrasted with *Mason v. Bitton*, 85 Wash.2d 321, 534 P.2d 1360 (1975). There a speeding automobile was being pursued by police when the driver, at a speed of 140 miles per hour, lost control and collided with another vehicle killing himself and the occupants of the other vehicle. That court held that the decision to pursue was an operational deci-

sion, not falling within the discretionary function exemption to tort liability. Hence, liability could be placed on the state.

In our view, the acts would clearly fall within the police power and the court's holding a judicial invasion of the operations of another branch of government. *Mason* seems impossible to reconcile with that court's prior cases. It should be noted that the collision occurred between the pursued vehicle and an oncoming car. If the colliding vehicle had been that of the police, a different rule might be applicable. *See also Halvorson v. Dahl*, 89 Wash.2d 673, 574 P.2d 1190 (Wash.1978), wherein the Washington court held that the plaintiff widow of decedent stated a claim against the city whose alleged negligence in enforcing the building and safety codes caused the death of decedent in a hotel fire. *But see Georges v. Tudor*, 16 Wash.App. 407, 556 P.2d 564 (1976).

In *Modlin v. City of Miami Beach*, 201 So.2d 70 (Fla.1967), plaintiff decedent was crushed by the partial collapse of a retail store and the city was named a defendant on the basis of alleged negligent performance of inspection of construction in progress and failing to discover the defect which caused the collapse. That court suggested that legislative and judicial discretion will not sustain municipal liability in tort, but such liability will be sustained in the case of executive or administrative activity. The court found that the activity complained of fell within executive or administrative activity, but nevertheless plaintiff could not recover since the city building inspector at the time he allegedly negligently performed the inspection "owed no duty to Mrs. Modlin in any way different from that owed to any other member of the public. Therefore, the city is not liable under the rule of respondeat superior." At 76. The court said also, "We do not attempt to grapple with the question, much-litigated in other jurisdictions, but apparently not in Florida, whether the public officers are not immune from tort liability for injury resulting from their discretionary acts." *Id.*

*See also* the following cases of the Florida Court of Appeals: *Dep't of Health & Rehabilitative Services v. McDougall*, 359 So.2d 528 (Fla.App.1978); *Cheney v. Dade County*, 353 So.2d 623 (Fla.App.1977); *Sapp v. City of Tallahassee*, 348 So.2d 363 (Fla. App.1977); *Gordon v. City of West Palm Beach*, 321 So.2d 78 (Fla.App.1975); *Florida First National Bank of Jacksonville v. City of Jacksonville*, 310 So.2d 19 (Fla.App.1975), *cert. denied* 339 So.2d 632 (Fla.1976). All of such cases appear to have held that recovery was not allowed on the basis that the duty, if any owed by the governmental entity, was not to any individual person, but rather to the public in general.

In *Coffey v. City of Milwaukee*, 74 Wis.2d 526, 247 N.W.2d 132 (1976), plaintiff brought action against the city and its building inspector to recover for fire damage allegedly caused by the building inspector's negligence in inspecting the premises for fire danger. The Wisconsin court repudiated the distinction between governmental and proprietary act and refused to follow the rationale of cases discussed in *Modlin v. City of Miami Beach*, 201 So.2d 70 (Fla.1967); *Hoffert v. Owatonna Inn Towne Motel, Inc.*, 293 Minn. 220, 199 N.W.2d 158 (1972); and *Duran v. City of Tucson*, 20 Ariz.App. 22, 509 P.2d 1059 (1973). The court in *Coffey* held that the imposition of liability did not always flow from a finding of negligence and cause in fact but rather that the decision should rest on considerations of public policy. The court stated:

"Thus, this court has held that even where the chain of causation is complete and direct, recovery may sometimes be denied on grounds of public policy because: (1) [t]he injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tort-feasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) because allowance of recovery would place too unreasonable a burden on the negligent tortfeasor; or (5) because allowance of

recovery would be too likely to open the way for fraudulent claims; or (6) *allowance of recovery would enter a field that has no sensible or just stopping point."* 247 N.W.2d at 140. (Citations omitted; emphasis supplied.)

The court concluded:

"[T]he dispute here involves public policy considerations and requires the balancing of various policy factors, in determining whether there is to be liability at all, and, if so, the extent thereof. The instant case involves a complex issue of municipal tort liability arising out of the alleged negligence of a building inspector in carrying out fire inspections. The factual connections are so attenuated that a full trial should precede this court's determination of the policy considerations." 247 N.W.2d at 140–41.

*See Lifer v. Raymond,* 80 Wis.2d 503, 259 N.W.2d 537 (1977), wherein a guest passenger who had been injured in a one-car automobile accident brought an action against the road test examiner employed by the State Department of Transportation alleging that the examiner was negligent in granting the driver of the car a probationary driver's license because the driver was so grossly obese as to prevent her from exercising reasonable control over a motor vehicle. Therein liability was denied with the court holding that the determination of the examiner as to the ability of an applicant involved an exercise of judgment and discretion.

In *Hoffert v. Owatonna Inn Towne Motel, Inc.,* 293 Minn. 220, 199 N.W.2d 158 (1972), a fire had occurred in a motel injuring the four plaintiffs and it was alleged that the granting of the building permit for changes was in violation of the building code and hence the municipality was liable for negligence. The court held that since a building inspector acted exclusively for the benefit of the public, as distinguished from an individual, any individual who was injured by an alleged negligent performance of the building inspector does not have a cause of action.

*See,* however, *Hansen v. City of St. Paul,* 298 Minn. 205, 214 N.W.2d 346 (1974). There the issues before the court were whether the municipality has committed a tort in permitting dogs known to be dangerous, vicious and impoundable to prowl uncontrolled upon the public sidewalks in a residential area. The court said, "[i]n so holding we are mindful that it may be claimed or believed this decision opens a Pandora's box with respect to municipal liability for other moving hazards upon the public streets and sidewalks, such as attacks upon pedestrians by public drunks or by persons committing violent or criminal acts." 214 N.W.2d at 350. The court held that since the city had knowledge of the vicious dogs prowling the public sidewalks, such did not constitute a discretionary function and the municipality was therefore not immune from liability. *See also, Lorshbough v. Township of Buzzle,* 258 N.W.2d 96 (Minn.1977). Therein a township which maintained a dump was held to have owed a duty of care to neighboring property owners who were damaged as a result of fire which started in the township dump.

In *Motyka v. City of Amsterdam,* 15 N.Y.2d 134, 204 N.E.2d 635 (1965), the court dealt with a claim against a municipality as a result of a fire. The court held that liability would exist only, and such was not found, if a duty was found to use due care for the benefit of particular persons as distinguished from the duty to the general public to supply adequate police or fire protection.

*See also,* however, *Smullen v. City of New York,* 28 N.Y.2d 66, 320 N.Y.S.2d 19 (1971), wherein liability was found when an inspector noted a violation of building codes when a trench had been over-excavated without bracing or shoring and the inspector had led decedent into a position of peril. The court held that the presence and approval of the inspector created a special relationship and, therefore, a duty to the particular individual decedent. *Motyka* was therefore distinguished. *See also Florence v. Goldberg,* 48 A.D.2d 917, 369 N.Y.S.2d 794 (1975), wherein it was held that a regulation relating to a school crossing guard resulted in a special

duty to school children and that the municipality was therefore not exempt from liability. This case was affirmed by the New York Court of Appeals, 44 N.Y.2d 189, 375 N.E.2d 763 (1978).

*See,* however, *Klee v. State,* 94 Misc.2d 284, 404 N.Y.S.2d 772 (1976).

*See also Bruno v. Codd,* 90 Misc.2d 1047, 396 N.Y.S.2d 974 (1977), regarding an action brought against police officers, the probation department and family court on the ground that they had failed to protect and assist wives assaulted by husbands.

*See also Stranger v. New York State Electric & Gas Corp.,* 25 A.D.2d 169, 268 N.Y.S.2d 214 (1966).

In *Jahnke v. Incorporated City of Des Moines,* 191 N.W.2d 780 (Iowa 1971), a plaintiff had sued the municipality for damages when he was injured by stones thrown by a mob standing on a street corner. The court held that there was no duty owing an individual citizen from a municipality or its police force since there was no duty running to the plaintiff individually as distinguished from a member of the general public. *See also Hannon v. Counihan,* 54 Ill.App.3d 509, 12 Ill.Dec. 210, 369 N.E.2d 917 (Ill.App. 1977); and *Dufrene v. Guarino,* 343 So.2d 1097 (La.App.1977).

In *Duran v. City of Tucson,* 20 Ariz.App. 22, 509 P.2d 1059 (1973), the Arizona Court of Appeals held that when a plaintiff was injured as a result of fire which in turn allegedly resulted from the municipality's failure to annually inspect the premises of plaintiff's employer, no recovery could be had since, although the doctrine of governmental immunity has been abrogated, the only duty owed was to the public in general as contrasted with a duty to an individual.

In *Grimm v. Arizona Bd. of Pardons and Paroles,* 115 Ariz. 260, 564 P.2d 1227 (1977), the Arizona court held that the negligent release of a highly dangerous prisoner on parole by the parole board narrowed the otherwise public duty of the board to the decedent who was shot during a robbery by the parolee. The liability of the board of pardons was upheld by the court, stating,

"negligent performance of a duty voluntarily undertaken may be a basis for liability." 564 P.2d at 1234. The court also stated, "While leaving intact the absolute judicial immunity enjoyed by participants in judicial proceedings, we now abolish the absolute immunity previously granted to public officials in their *discretionary functions.*" 564 P.2d at 1233. (Emphasis supplied.) The first paragraph of the dissent of Hays, J., is worthy of quotation:

"Beware, oh unsuspecting trial judge, that when your decision to place a felon on probation goes horribly awry, the majority of my brothers sitting in cloistered ivory tower call your action gross and subject you to the consequences thereof. I hasten to concede that the majority opinion does not say this but logic tells me that the discretionary acts of the parole board need no less protection than those of the sentencing judge. There may be boards or commissions, bastions of bureaucracy, which should not be accorded the protection of quasi-judicial immunity, but the parole board is hardly one of these." 564 P.2d at 1237.

*See,* however, the later Arizona cases of *Wesley v. State,* 117 Ariz. 216, 571 P.2d 1057 (1977), wherein it was held that the Department of Liquor Licenses had no duty to protect a patron of a bar, although the board had information of prior violence, and failed to revoke or suspend the license, and *McGeorge v. City of Phoenix,* 117 Ariz. 272, 572 P.2d 100 (1977), where liability was denied against a municipality who failed to protect a vehicle owner against the known violent propensities of a neighboring property owner.

In 1961, the Supreme Court of California in *Muskopf v. Corning Hospital Dist.,* 55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457, abrogated the previous existing doctrine of governmental immunity for tort in California. The Court stated, "[t]he rule of governmental immunity for tort is an anachronism, without rational basis, and has existed only by the force of inertia." 11 Cal.Rptr. at 92, 359 P.2d at 460. That decision was heavily relied upon in this Court's

decision in *Smith v. State,* 93 Idaho 795, 473 P.2d 937 (1970). The Court in *Muskopf,* speaking through Mr. Justice Traynor, went on to indicate, however, that abrogation of governmental immunity does not mean that the state is liable for all harms that result from its activities. "Both the state and individuals are free to engage in many activities that result in harm to others so long as such activities *are not tortious.*" 11 Cal. Rptr. at 94, 359 P.2d at 462. (Emphasis supplied.) The Court there attempted to distinguish between officials' negligent performance of ministerial duties (for which they could be held liable) and discretionary acts within the scope of their authority (for which they would not be held liable). The Court held that insofar as discretionary acts are concerned, the justification for not abolishing such immunity was the danger of diminishing the desire of public officials to carry out their duties. See *Gregoire v. Biddle,* 177 F.2d 579 (2nd Cir. 1949) (Learned Hand, J.).

Issued the same day as *Muskopf* was the case of *Lipman v. Brisbane Elementary School Dist.,* 55 Cal.2d 224, 11 Cal.Rptr. 97, 359 P.2d 465 (1961). Therein it was alleged that the school trustees sought to discredit the school superintendent and force her from her position. The court held that the trustees were acting within the scope of their discretionary, as contrasted with ministerial, powers and were, therefore, within the continued immunity rule.

In 1963 the California legislature enacted a tort claims act and exempted from that legislative abolition of sovereign immunity "discretionary" actions. In 1968, in *Johnson v. State,* 69 Cal.2d 782, 73 Cal.Rptr. 240, 447 P.2d 352 (1968), the court had for consideration the claim that the California Youth Authority had acted negligently in allowing a 16 year old boy with homicidal tendencies and a background of violence and cruelty to be placed in the home of plaintiffs, who would act as foster parents. Plaintiffs thereafter suffered personal injuries by reason thereof. It was alleged that the State had a duty to warn of a foreseeable peril and had failed to do so.

The Court in *Johnson* attempted again to distinguish between an immune "discretionary" decision and an unprotected ministerial act. It used language such as:

"[a]dmittedly, our interpretation will necessitate delicate decisions; the very process of ascertaining whether an official determination rises to the level of insulation from judicial review requires sensitivity to the considerations that enter into it and an appreciation of the limitations on the court's ability to reexamine it. Despite these potential drawbacks, however, our approach possesses the dispositive virtue of concentrating on the reasons for granting immunity to the governmental entity. It requires us to find and isolate those areas of quasi-legislative policy-making which are sufficiently sensitive to justify a blanket rule that courts will not entertain a tort action alleging that careless conduct contributed to the governmental decision." 73 Cal. Rptr. at 248–249, 447 P.2d at 360–61.

Aside from the language above quoted, the California court failed to resolve the problem and "avoid this potential quagmire."

In *McCorkle v. City of Los Angeles,* 70 Cal.2d 252, 74 Cal.Rptr. 389, 449 P.2d 453 (1969), plaintiff was injured when, following an automobile accident, he and a city policeman were standing in an intersection where a previous accident had occurred and plaintiff was struck by an oncoming automobile. It was contended that the policeman's act in investigating the accident was "discretionary" and thus immune. The court found that while the police officer may have been exercising discretion in undertaking his investigation, the injury to plaintiff was not the result of that exercise of discretion, but rather resulted from the negligence of the officer which followed his exercise of discretion. Hence, the court found no immunity.

In *Ramos v. County of Madera,* 4 Cal.3d 685, 94 Cal.Rptr. 421, 484 P.2d 93 (1971), it was alleged that two families who were the recipients of public assistance were required to work as a condition to receiving further assistance. An action was brought seeking

injunctive and declaratory relief on the basis that minors had been "wrongfully coerced to work." The court said:

"The tortious acts complained of consist of coercing plaintiffs to work as a condition to receiving AFDC payments [contrary to various statutes] . . ." 94 Cal.Rptr. at 425, 484 P.2d at 97.

The court stated:

"[i]n *Johnson* we reviewed the semantic quicksand which had ensnared the concept of 'discretion' in an an unyielding trap of incomprehensibility. We noted that discretionary acts have been defined as 'those wherein there is no hard and fast rule as to the course of conduct that one must or must not take.' [Citations omitted]) Finding the semantic distinctions between 'discretionary' and 'ministerial' inadequate as a method of deciding actual controversies, we followed our landmark precedent of *Lipman v. Brisbane Elementary School Dist., supra,* in concentrating on policy considerations relevant to the government claim of immunity. Discretionary activity, we held, is that related to basic policy decisions, or that activity sometimes characterized as the 'planning' as opposed to the 'operational' level of decision making." 94 Cal. Rptr. at 426–427, 484 P.2d at 98–99.

The court continued,

"We are satisfied that a public entity may be liable in tort pursuant to Government Code, section 815.6, where it knows or should know that its failure to exercise its duty to reasonably supervise employees will result in coercing others to violate state laws, and where such violation proximately results in an injury of the kind which the law was designed to prevent. Public entities have, inter alia, a mandatory duty to obey legislative enactments, of which the entities must conclusively be presumed to have knowledge. Public entities certainly have a mandatory duty not to coerce others—either by force or by a threatened withdrawal of life-sustaining aid—to *violate* state laws, whether or not the entity is specifically charged with enforcing that particular

law. Nor does any employee have 'discretion' to coerce California citizens to break the law." 94 Cal.Rptr. at 428–429, 484 P.2d at 100–01.

Hence, the court found that a cause of action had been stated and that the acts did not fall within the immune area.

In *Baldwin v. State,* 6 Cal.3d 424, 99 Cal.Rptr. 145, 491 P.2d 1121 (1972), plaintiff's vehicle was struck from the rear and knocked into another lane of traffic where it was struck head-on. The California statutes provided that there shall be no governmental liability for an injury caused by the plan or design of a construction of or improvement to public property where such plan or design has been approved in advance of the construction or improvement by the legislative body. Such is similar to the Idaho statute. The court stated the question to be whether design immunity once having attached is perpetually effective regardless of any subsequent change of conditions. The court stated:

"Having approved the plan or design, the governmental entity may not, ostrich-like, hide its head in the blueprints, blithely ignoring the actual operation of the plan. Once the entity has notice that the plan or design, under changed physical conditions, has produced a dangerous condition of public property, it must act reasonably to correct or alleviate the hazard." 99 Cal.Rptr. at 151, 491 P.2d at 1127.

Summary judgment in favor of the State was reversed.

In *County of Sacramento v. Superior Court of Sacramento County,* 8 Cal.3d 479, 105 Cal.Rptr. 374, 503 P.2d 1382 (1972), the real parties in interest sought damages for wrongful death resulting from a prisoner escaping from a jail maintained by the defendant. Liability was denied on the basis of statutory immunity from liability dealing with escaped prisoners. Plaintiffs contended that the act of leaving the jail door unlocked was not a discretionary act, but was ministerial in nature, but such argument was rejected by the court.

In *HFH, Ltd. v. Superior Court of Los Angeles County,* 15 Cal.3d 508, 125 Cal. Rptr. 365, 542 P.2d 237 (1975), plaintiffs sought alternative remedies in the nature of inverse condemnation or for damages in tort by reason of the municipality's adoption of zoning plan which allegedly damaged plaintiff's property. The court, in holding no liability in the tort aspect of the action, cited the dissent of Jackson, J. in *Dalehite v. United States, supra,* stating, "Justice Jackson's mot expresses both a principal of law and a necessity of rational government; both constitutional and institutional understandings require that legislative acts, even if improper, find their judicial remedy in the undoing of the wrongful legislation, not in money damages awarded against the state." 125 Cal.Rptr. at 373, 542 P.2d at 245.

In *Tarasoff v. Regents of the University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976), the California court took another major step. There a patient had confided to his therapist his intention to kill plaintiff's daughter. Although there was no relationship between the victim and the doctor, the court nevertheless held that a cause of action had been stated. The court, in so holding, stated:

"In analyzing this issue, we bear in mind that legal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done. . . . The assertion that liability must . . . be denied because defendant bears no 'duty' to plaintiff 'begs the essential question—whether the plaintiff's interests are entitled to legal protection against defendant's conduct. . . . [Duty] is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." 131 Cal.Rptr. at 22, 551 P.2d at 342. (Citations omitted.)

Hence, the court held that plaintiff had stated a case for the therapist's negligent failure to warn the victim. The court held that although no special relationship existed between the victim and the therapist, there did exist between the killer and his therapist a relationship of patient and doctor. The court said, "[s]uch a relationship may support affirmative duties for the benefit of third persons." 131 Cal.Rptr. at 23, 551 P.2d at 343. (The dissent points out the resulting problem of the breach of the physician-patient relationship, the inherent difficulty in a therapist forecasting the danger of violence, the necessity of confinement to prevent the danger and the risks to society in general of a rule which enlarges the numbers of the mentally ill required to be confined.) On the issue of the discretionary act exemption, the court simply held that since the rule laid down was applicable to private therapists, the same must necessarily apply to and liability result toward every governmentally employed therapist.

In *Sanborn v. Chronicle Publishing Co.,* 18 Cal.3d 406, 134 Cal.Rptr. 402, 556 P.2d 764 (1976), plaintiff brought an action for defamation against the City and County of San Francisco and its clerk. The clerk had been holding monies of the plaintiff which he released to plaintiff and explained the transaction to a newspaper reporter in terms unflattering to plaintiff. The court held that the activities of the clerk did not fall within the immunized discretionary act area stating, "A governmental officer's discussion with the public or press regarding the functioning of his office would seem, instead, to fall within the category of those routine, ministerial duties incident to the normal operations of that office." 134 Cal. Rptr. at 407, 556 P.2d at 769.

In *Morris v. County of Marin,* 18 Cal.3d 901, 136 Cal.Rptr. 251, 559 P.2d 606 (1977), plaintiff, who was injured in the course of his employment and was unable to secure any workmen's compensation benefits because his employer was uninsured, brought suit against the county for its failure to require the employer, in obtaining a building permit, to file a certificate of workmen's compensation insurance. Although the statute provides that a public entity is not liable for injury caused by the issuance, denial, suspension or failure or refusal to

issue or deny, suspend or revoke a permit, such did not deter the court from finding liability. The court said:

> "A public entity, of course, does not have authority to determine 'whether or not' to issue a permit when it only performs a ministerial, non-discretionary duty. In such cases, the 'basic policy decision' has already been made at a different governmental level. . . . Thus, the statutory language itself suggests that the section's immunity attaches only to discretionary activities." 136 Cal.Rptr. at 258, 559 P.2d at 613. (Citations omitted.)

The court stated, "[t]o reiterate, in the instant case, plaintiff seeks to impose liability on the county not for failure to discharge a discretionary governmental function, but rather for failure to perform a mandatory duty which the county could not in its discretion ignore." 136 Cal.Rptr. at 261, 559 P.2d at 616.

We now return to a consideration of Idaho's court made and statutory law.

This Court in *Smith v. State,* 93 Idaho 795, 473 P.2d 937 (1970), first held that the doctrine of sovereign immunity was not a valid defense in actions based on tortious acts of the state. We deem it clear that *Smith* did not create a new cause of action, but was rather the abolition of a total defense to an action in the traditional and orthodox field of tort liability. The Court stated:

> "Each of the three cases now before this Court presents an identical question; viz., whether or not the doctrine of sovereign immunity with regard to the tort liability of the State of Idaho is to be abolished.
>
> 'An immunity * * * avoids liability in tort under all circumstances * * it is conferred, not because of the particular facts, but because of the *status or position of the favored defendant; and it does not deny the tort, but the resulting liability.*' W. L. Prosser, Law of Torts, 996 (3d ed. 1964)." At 799, 473 P.2d at 941.

The Court pointed out that it was irrational to deny recovery to a plaintiff who suffered personal injury because of negligent acts of the state when recovery would have been allowed if the defendant had been a private individual.

The Court set forth the standard of care required of the state in the maintenance of state highways, "it is our opinion that the standard should be similar to that owed by a private individual who is the owner or possessor of land to an invitee." At 804, 473 P.2d at 946. The Court then proceeded to lay out the specific standard of care placed upon the state, which is substantially the same as any other owner or possessor of land owes to an invitee.

Thereafter, our legislature in 1971 (1971 Idaho Sess.Laws Ch. 150) enacted the Idaho Tort Claims Act. The opening language of that legislation provided:

> "Waiving the defense of sovereign immunity of the state and its political subdivisions; providing that this act shall be known and cited as the 'Idaho Tort Claims Act'; providing definitions; providing liability of the state and its political subdivisions for their tortious conduct and providing for exceptions; providing exceptions to tort liability . . . ."

Section II(7) of that act (now codified as I.C. § 6–903(a)) provides that a governmental entity shall be liable for acts "where the governmental entity if a private person or entity would be liable for money damages under the laws of the state of Idaho."

As we have indicated above, there is no uniformity of interpretation of such language by courts nor are there alternative interpretations from which we might select as persuasive that one interpretation most supported by logic and reason. Rather, we find a melange of decisions wherein reason at times seems to have flown out the window. At one extreme, we find decisions which appear to make a mockery out of the oft repeated maxim of Jackson, J., dissenting in *Dalehite,* that "it is not a tort for a government to govern." Decisions which under the guise of *tort* liability theory award damages for: a killing by a murderer while law enforcement officers were engaged in attempted crime prevention

(*Downs v. United·States, supra*); for death or injury perpetrated by a convicted felon whom penal officials believed was sufficiently rehabilitated to enter society (*Grimm v. Arizona Board of Pardons, supra*); welfare recipients being required to work (*Ramos v. County of Madera, supra*). At the other extreme, we have the decision of the highest court in the land in *Dalehite* denying recovery in a situation in which a private person would assuredly be held to liability, but the government is deemed immune solely because of the governmental official level at which a decision was made to endanger others.

Hence, although we may derive some scintilla of intent from the legislative language, we are left with the task of determining and enunciating policy. We hold that our legislature has intended that wherein tort liability would attach to a private person, a governmental entity engaging in the same conduct will be liable. We do not ascertain an intent to create a new cause of action against a governmental entity for its attempts to govern.

We postulate that if government is not able to govern, anarchy and chaos are the only alternatives. If government is to govern, persons must be selected to operate and implement the abstract notions of what government should do. If government is to perform the function of controlling the interrelationships between individual members of our society (admittedly an oversimplification), it must be able to provide standards of conduct whether they be called statutes, regulations, ordinances, ukases or decrees. With exceptions not applicable here, such functions of government have traditionally been seen as sacrosanct from invasion by the judicial branch.

Here we are faced with claims against the government relating to the governmental function of governing. There are not parallel functions in the private sector. We are essentially concerned with the abilities of officials, the enactment of regulations, and the enforcement of standards. A finding of liability for breach of those "duties" running to plaintiffs would result in the creation of a new cause of action which we deem not to be contemplated by our legislature, and foreign to traditional concepts of the law of torts.

We do not so find on the basis that the duty alleged runs only from the government to society at large, rather than to these particular and individual plaintiffs. We do not so find on the basis that the performance of governmental employees would be inhibited. We do not so find on the basis that there should be a distinction between decisions made by a cabinet officers, viz-a-viz, a governmental employee truck driver. Our decision today is bottomed on the allegation of plaintiffs' complaints. As a case of first impression in Idaho, we need go no further. Other cases on other days which present other problems of analysis are best left to be decided on a case by case basis. To the end that this not be misconstrued, we do not contemplate that liability under the Idaho Tort Claims Act will result only from damages resulting from automobile accidents. Hopefully, our marginal comments relating to other decisions from other jurisdictions will suffice in this regard.

The cause as it relates to the Union is reversed and remanded for further proceedings. The cause as it relates to the State is affirmed.

DONALDSON, C. J., and McFADDEN, J., concur.

BAKES, Justice, specially concurring in Part I:

In light of the decisions of the Supreme Court of the United States in *Sears, Roebuck & Co. v. San Diego Dist. Council of Carpenters*, 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978), and *Farmer v. Carpenters, Local 25*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), I concur with the majority's ruling that the trial court erred in dismissing the appellants' wrongful death action against respondent United Steelworkers because of the preemption doctrine. An action for wrongful death is a creature of our state statutes, is of substan-

tial local interest, and traditionally has been committed to the jurisdiction of the courts of the state. Moreover, this action for wrongful death is unlikely to present the identical legal issues as a proceeding under the federal labor laws arising from this same factual setting. Assertion of jurisdiction by the courts of this state over the appellants' action would appear to present no significant risk of undue interference with national labor policy.

Nevertheless, in both *Farmer* and *Sears, Roebuck,* the court ruled that the jurisdiction of the state courts and state tort law was not preempted, only after a careful scrutiny of the legal issues raised by the actions under state law—intentional infliction of emotional distress in *Farmer* and trespass in *Sears, Roebuck.* In the instant case the precise nature of the legal issues raised by the appellants' wrongful death action is not entirely clear at the present procedural posture of the case. Indeed, it has not yet been determined by either the trial court or this Court that the appellants' complaint in fact states a claim for relief in tort against the respondent union. *Cf. Just's, Inc. v. Arrington Constr. Co.,* 99 Idaho 462, 583 P.2d 997 (1978) (ordinarily mere breach of contract not a tort); *see also McAlvain v. General Ins. Co. of America,* 97 Idaho 777, 554 P.2d 955 (1976); *Taylor v. Herbold,* 94 Idaho 133, 483 P.2d 664 (1971). That issue was not briefed in this appeal and so we do not reach it.

In my view a final decision whether the wrongful death action against the respondent union is preempted by federal labor laws must therefore await a full factual development of the legal issues raised under our state tort law.

DONALDSON, C. J., and McFADDEN, J., concur.

BISTLINE, Justice, concurring and dissenting.

I join the Court's opinion wherein it is held that summary judgment of dismissal in favor of the United Steelworkers should not have been granted. I am unable to agree that the State of Idaho was entitled to a dismissal at the summary judgment stage of the action against it, and briefly state the reasons which in my view require that that cause, too, should be heard and determined on the merits.

In my view the deceased miners who entered the portals of Sunshine's mine not only had a right to rely upon the allegedly assumed duty of the union to inspect the conditions and practices prevalent in that mine, but equally had a right to rely upon the State's statutory obligation. The obvious question here is: Who, if not the State and if not the union, had the obligation to assure the miners that they were not being subjected to dangerous working conditions and practices? An easy answer, of course, is that the miners could see for themselves the conditions and practices, and could, so to speak, stay out of the kitchen if they didn't like the heat. However, I think that most will agree that such philosophy no longer obtains in this country. These miners, with dependents to support, were not exactly free spirits who could simply leave a job, the conditions of which may have appeared unsafe. Whether or not they were aware of any dangerous existing conditions and practices, by reason of their daily exposure thereto, it is the widows and children of those deceased miners who are the plaintiffs in these statutory wrongful death actions, and their right to rely upon the defendants' fulfillment of their alleged obligations to look out for the safety of their fathers and husbands is no less than the right in the miners themselves.

It is claimed by the widows and children that the State of Idaho was negligent in regard to its obligation to inspect the mines and secure to the miners safe working conditions. The State of Idaho responds that the pertinent Idaho statutes and regulations imposed upon the Inspector of Mines and his deputies duties which were wholly "discretionary" in nature, and hence liability for negligence may be avoided by application of that section of the Idaho Tort Claims Act which exempts the State from its negligence with respect to a discretionary function or duty on the part of the State or its employee.

The briefs are replete with lengthy citation of authority intended to light the way in concluding that the State's activity in mine safety was or was not a discretionary function, but the divergence of view is great, as might be expected. None of this case authority bears any close resemblance to the relationship we consider today—the assumed obligation of the State of Idaho for the safety of the man who works in the dark and unknown world below the surface of the earth.

The State in its brief, while decrying as mechanical an approach (by the widows and children) which would categorize and distinguish between that which is "operational" and that which is "planning level" in its turn would have us equate the mine inspector's duties with those of a building inspector. The State relies heavily on the Minnesota case of *Hoffert v. Owatonna Inn Towne Motel, Inc.,* 293 Minn. 220, 199 N.W.2d 158 (1972), urging upon us that that court held "that in order to recover plaintiffs had to show a breach of some duty owed to them in their individual capacities, and not merely a breach of some obligation *owed to the general public.*" State's Brief at 52. For the same proposition the State cites and discusses *Amato v. City of New York,* 268 F.Supp. 705 (S.D. N.Y.1967), *Ivicevic v. City of Glendale,* 26 Ariz.App. 460, 549 P.2d 240 (1976), *Delarosa v. State,* 21 Ariz.App. 263, 518 P.2d 582 (1974), *Duran v. City of Tucson,* 20 Ariz.App. 22, 509 P.2d 1059 (1973), *Hensley v. Seminole County,* 268 So.2d 452 (Fla.App. 1972), *Fiduccia v. Summit Hill Construction Co.,* 109 N.J.Super. 249, 262 A.2d 920 (1970), *Evers v. Westerberg,* 38 A.D.2d 751, 329 N.Y.S.2d 615 (1972), *Whitney v. City of New York,* 27 A.D.2d 528, 275 N.Y.S.2d 783 (1966), *Stranger v. New York State Electric & Gas Corp.,* 25 A.D.2d 169, 268 N.Y.S.2d 214 (1966), *Stubley v. Allison Realty Co.,* 124 App.Div. 162, 108 N.Y.S. 759 (1908), *Reid v. City of Niagara Falls,* 29 Misc.2d 855, 216 N.Y.S.2d 850 (1961), and *Lockwood v. Village of Buchanan,* 18 Misc.2d 862, 182 N.Y.S.2d 754 (1959). Following its discussion of these cases the State declares that:

"It is through the instrument of regulations and safety standards, inspections and compliance orders, that the State seeks to regulate safety and health conditions in mines, with the view of accommodating both the interests of the mine operators and workers. However, responsibility for the operations and control over mine facilities remains a private venture and not the direct responsibility of the State." State's Brief at 61.

It seems quite clear to me that the concern of the State of Idaho with regard to the mines of this State has nothing whatever to do with the general public. It is equally clear that the responsibility of the mine owners to furnish a safe place in which to work, abrogated by the Workmen's Compensation Law insofar as civil liability is concerned, does not in any way lessen the duty of mine inspection which the State has assumed to carry out by reason of well-intended legislative enactment. A mine is not a public building. It is not a public place. There is nothing in this record which intimates that the families of these disaster victims ever had any access into that mine, or any right of access. In fact, other than that the legislature created in the mine inspector the power and authority to enter the mines of this state, it is doubted that he would have any greater access to those mines than that available to the public in general, which so far as appears is by invitation only.

It is also important to note that the provisions of I.C. § 47–104 (current version at I.C. § 44–109) are aimed, not at all at protecting the public against dangerous or insecure conditions, but "for the purpose of making said mine safe for the employees therein . . ."

Notwithstanding the foregoing, the State tells us in its brief that the duty imposed on the mine inspector "existed for the benefit of the public in general" and at another place that the mine inspector's decisions are "of public safety" and his decision "involves a balancing of competing policy considerations, accommodating both the interests of the mine operators and workers."

Nothing which I read in the statutory enactments suggests in the least that the mine inspector was to make a policy judgment and perform a balancing act which would afford some measure of protection to the miners so long as it also accommodated the interests of capital. Quite the contrary, the policy determination had been made by the legislature. That determination was that miners were to be afforded the protection of government controlled examination and inspections so as to insure those miners safe working conditions and practices. That determination was that the State do this by a qualified person upon whom was conferred certain specified powers and authority—with concomitant obligations to those miners who were perceived by the legislature to be in need thereof.

The only issue before us is whether the action should have been terminated on motions for summary judgment. My vote is that it should not have been. That is not to say that each defendant might not be entitled to a judgment of involuntary dismissal when the evidence has all been presented, but until that has been done, neither this Court nor the trial court are in any position to rule as a matter of law that the widows and children of the deceased miners are without any claim for relief for the losses suffered allegedly by reason of the negligence of the defendants. *Brown v. United States,* 374 F.Supp. 723 (E.D.Ark.1974), *State of California v. United States,* 151 F.Supp. 570 (N.D.Cal.1957), *Bulloch v. United States,* 133 F.Supp. 885 (C.D.Utah 1955), *Guy F. Atkinson Co. v. Merritt, Chapman, & Scott Corp.,* 126 F.Supp. 406 (N.D.Cal. 1954). What Justice Bakes has written in his concluding paragraph is appropriate to the motion of the State of Idaho as well as to the motion of the United Steelworkers.